### ROSENEAU v. EMPIRE CIRCUIT CO. et al.

(Supreme Court, Appellate Division, Fourth Department. March 3, 1909.)

1. CONTRACTS (§ 116*)—BOOKING THEATER ATTRACTIONS—CONTRACT FOR EXCLUSIVE SERVICE—VALIDITY.

A company controlling theaters in different places may lawfully book an attraction for its theaters on condition that the owner of the show will not play in competing theaters, and that he will not enter into any contract that will deprive the company of playing any of his attractions in its different theaters at such time as it may desire.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 116.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CONTRACTS (§ 116*)—BOOKING THEATER ATTRACTIONS—CONTRACT FOR EX-
CLUSIVE SERVICE—VALIDITY.

In insisting on such condition, the company is within its legal rights,
notwithstanding it induces the owners of shows to violate contracts with
a competing company, and practically prevents it from obtaining suitable
attractions for its theater.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 116.*]

3. CONTRACTS (§ 102*)—BOOKING THEATER ATTRACTIONS—CONTRACT FOR EX-
CLUSIVE SERVICE—LIABILITY TO COMPETITOR·IN CASE OF MALICE.

If a theater circuit company was actuated by malice in lawfully booking
attractions for its different theaters on condition that the owners of
the shows should not serve the owners of theaters not controlled by it,
and thus ruined the business of a competing theater, it would not be
liable, since, if the means employed to do an act are legal and lawful,
it is of no consequence that the motive which induced it was malicious.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 102.*]

4. CONSPIRACY (§ 8*)—RUINING BUSINESS OF THEATER—LIABILITY FOR LAWFUL
ACTS.

No action for conspiracy to ruin a theater business lies against a rival
theater company and its directors, whose methods of contracting for
shows deprived a theater of suitable attractions, if defendants only did
what they had a legal right to do for the financial advantage of the com-
pany.

[Ed. Note.—For other cases, see Conspiracy, Dec. Dig. § 8.*]

5. TORTS (§ 4*)—PEFORMANCE OF LEGAL ACTS—EFFECT OF MALICE AND DESIRE
TO INJURE.

A man may do or perform such legal acts as will result in his advan-
tage, and, having done and performed them with that end in view, it is
unimportant that he was actuated by malice and a desire to injure an-
other.

[Ed. Note.—For other cases, see Torts, Cent. Dig. § 4; Dec. Dig. § 4.*]

Appeal from Trial Term, Erie County.

Action by Edward J. Roseneau, as receiver of the Court Street
Theater, against the Empire Circuit Company and others. From a
judgment for plaintiff, and from an order denying a new trial, defend-
ants appeal. Reversed.

The action was commenced on the 10th day of January, 1902, to recover
damages against the defendants for an alleged unlawful conspiracy malicious-
ly formed by them to ruin the business of the Court Street Theater, in the
city of Buffalo, N. Y., leased and conducted by the Court Street Theater Com-
pany, of which the plaintiff is receiver, he being authorized by order of the
court to continue this action.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS,
KRUSE, and ROBSON, JJ.

Daniel J. Kenefick (Rankin D. Jones, of counsel), for appellants.
Simon Fleischmann (Frank F. Williams, of counsel), for respondent.

McLENNAN, P. J. The Court Street Theater Company, of which
the plaintiff is receiver, is a domestic corporation. From the time of
its incorporation in the year 1895 until the 17th day of March, 1902,
when the plaintiff was appointed receiver of said company, it, as
lessee, was engaged in the city of Buffalo, N. Y., in conducting the
Court Street Theater, so called. Said company played and conducted

at said theater burlesque performances only, and during the time mentioned had practically no competitor in such city. Its business was run at a large profit, and it had established the valuable reputation of being the leading and only burlesque theater in the city of Buffalo. The defendant the Empire Circuit Company is a foreign corporation, organized about the year 1900 under the laws of the state of Ohio, having its principal office and place of business in Cincinnati. At all the times in question its business was conducted by a board of nine directors, among whom were the defendants Kernan and Rife. Each of the directors of said defendant company was the owner, lessee, or controlled one or more burlesque theaters, so called, and which were devoted exclusively to the accommodation of burlesque shows or attractions. The stock of such company was owned by the directors in proportion to the number of theaters which they respectively owned, leased, or controlled, and the business of such company was to contract with the persons, firms, or corporations owning or controlling burlesque shows or attractions to play in its theaters, to the end that all of such theaters might be continuously occupied, or as nearly so as possible, during any theatrical season. The theaters owned, leased, or controlled by the several directors of the defendant company were located in the cities of St. Louis, Kansas City, Indianapolis, Louisville, Pittsburgh, Cleveland, Cincinnati, Washington, Baltimore, and the city of Buffalo; only one of such theaters being located in each of said cities. As stated in respondent's brief:

"The theaters managed by the Empire Company were the principal burlesque theaters in the cities in which they were located."

There were practically only 41 burlesque shows or attractions in the middle and eastern parts of the United States which were suitable to be given or played in the defendant company's theaters or in the Court Street Theater. It appears that said 41 burlesque shows or attractions were not more than was reasonably necessary to supply the defendant company's theaters with suitable attractions. That being the situation, the defendant company resolved that it would not book any burlesque show or attraction to play in its theaters except upon condition that the owners of such burlesque shows or attractions would agree not to play in any theaters other than those owned, leased, or controlled by it, and, pursuant to such resolution, each of the owners of or persons controlling such burlesque shows or attractions were notified, in effect, that, if they gave their shows or played in any theater not owned or controlled by the defendant company, they would not be permitted to give their shows in the theaters owned by it. As a result of such resolution and notice, the owners of practically all of such burlesque shows or attractions voluntarily decided to show or play only in the theaters of the defendant company, and it appears that 19 or 20 of such owners had contracted with the Court Street Theater Company to play in its theater, but because of the action taken by the defendant company and the defendants Kernan and Rife each and all of such contracts were canceled, with the result that the Court Street Theater Company, · of which the plaintiff is receiver,

could not obtain any suitable attractions to play in its theaters, and therefore financial loss resulted to it.

We may assume, at least there is evidence to support the conclusion, that the defendants knew or had reason to believe that, if the plan adopted by them was carried out and acceded to by a considerable number of the owners of the burlesque shows, financial loss would result to the plaintiff, and that it would be difficult, if not impossible, for it to secure suitable attractions to play in the Court Street Theater. All other burlesque theaters which were not included in the defendants' lists would experience a like difficulty. It is practically conceded that the method of doing business adopted by the defendants was of very great advantage to them, and also to the owners of the. burlesque shows or attractions. The burlesque shows or attractions were thus enabled to be booked in advance, and to follow the circuit, so called, of theaters owned or controlled by the defendants, which, as we have seen, comprised the principal burlesque theaters in the middle and eastern parts of the United States. Any one of such shows or attractions could be given in Washington or Baltimore, and then in all the theaters owned by the defendant company, in regular order, thereby avoiding unnecessary travel and the expense incident thereto, and the theaters owned by the defendants were thereby assured of having their theaters continuously filled during any theatrical season. Before such plan was devised, it was common for a burlesque show to be booked in a western city for one week, then in an eastern city for another week, then be obliged to return to a western city, and so the company was compelled to travel long distances, thereby incurring large expense, in order to keep their engagements. It was also true that such theaters as afterwards were included in the defendant company were often closed because burlesque attractions could not be secured on account of the lack of method which prevailed. To meet that difficulty, the defendant company was formed, its prime purpose and intent being to provide its theaters constantly with shows and at the same time to enable the owners of the burlesque shows or attractions to keep their companies constantly employed after they had started upon the road, and so without incurring the expense of traveling a long distance to meet and keep their respective engagements.

The defendant company was an important corporation. When organized, it was authorized to issue capital stock to the amount of $50,000, which it did, and such stock was practically all taken at its par value by the owners of the theaters which it controlled. Its business from the outset was successful and profitable because, as we may assume, of the plan adopted by it which brought it and the owners of the theaters which it represented into harmonious relations with the owners of the principal burlesque shows or attractions, enabling them to give such shows at the minimum of expense. We conclude that the purpose and object of the defendants in the premises was legal, and that they had a perfect legal right to adopt and carry out the plan which they did in order to accomplish such purpose, notwithstanding it resulted in financial loss to the plaintiff's company, and prevented

it from procuring suitable attractions for the Court Street Theater. The evidence does not support the conclusion that the defendant corporation was organized and its method of doing business adopted because of malice which it entertained toward the plaintiff company or toward its principal owner, and there is no evidence from which it can be fairly concluded that the chief purpose which the defendants had in view was to ruin and destroy the business of the plaintiff's company. The evidence does tend to show that ill will existed between some of the defendants and the chief stockholder of the plaintiff company, and it is undoubtedly true that they desired to eliminate the competition which existed because of the ownership and operation of the Court Street Theater. Such ill will or feeling started because the owner of the Court Street Theater established competing burlesque theaters in the cities of Washington and Baltimore. It being the defendants' notion that there was only room for one such theater in either of those cities, and because of such action on the part of the owner of the Court Street Theater, the defendants Kernan and Rife opened a competing burlesque theater in the city of Buffalo, and adopted the plan to which attention has been called, which was acceded to by practically all the owners of burlesque attractions, with the result that the Court Street Theater practically ceased to be a competitor. Concededly the defendants or either of them had a right to open a theater which would be a competitor of the Court Street Theater in the city of Buffalo, the same as the plaintiff had a right to open and establish a competing theater in the city of Washington or Baltimore.

The contention of the plaintiff is that the defendants, in case they brought a burlesque attraction to the city of Buffalo and played it in their theater, the Lafayette, were compelled to permit the owner of a burlesque show so playing in it to play in the Court Street Theater, notwithstanding, perchance, the defendants had expended large sums of money in advertising and bring the burlesque show played in the Lafayette Theater to the attention of the people of the city of Buffalo. We consider that the defendants had the right to say to the owner of such burlesque show: "If we incur the expense of booking your attraction for the Lafayette Theater, you must agree not to play in the Court Street Theater"—and that the defendants had the right to say, "Your time must be at our disposal, and you shall not be permitted to make or enter into any agreement or contract which will deprive us of playing any of your attractions in any of the theaters which we own or control, and at such time as we may desire." May a corporation, not dealing in public necessities, utilities, or food products, determine that it will not employ any individual, firm, or corporation except upon condition that such individual, firm, or corporation will agree not to work for or to serve its competitors? The owners of the burlesque shows or attractions desired to secure employment; desired that they might be permitted to give such shows in the theaters owned or controlled by the defendant which comprise the principal theaters in the middle and eastern portions of the United States. The defendants were willing to give to the owner of such shows employment, but only upon condition that they would not serve the owners of theaters not owned or controlled by them. We think that the de-

fendants in insisting upon such condition were strictly within their legal rights, and so notwithstanding such condition imposed resulted in or induced 19 or 20 of the owners of burlesque shows or attractions to violate the contract entered into between them and the plaintiff company, and resulted in practically preventing the plaintiff company from obtaining suitable attractions to be played therein.

In the case of Ashley v. Dixon, 48 N. Y. 430, 8 Am. Rep. 559, it was held that no liability was incurred by C. because of the fact that he induced B. to break a contract entered into by him with A. for the purchase of A.'s real property. The court in that case said:

"But, even if defendant had induced Patrick not to perform his contract, that alone would not make him liable to the plaintiffs for damages. He could advise and persuade Patrick not to convey the land under his contract with McEachron, and could, by offering more, induce him to convey to himself, without incurring liability to McEachron, so long as he was guilty of no fraud or misrepresentation affecting McEachron."

In the case at bar it is not pretended that the defendant company, or its directors, agents, or representatives, made any false statement respecting the Court Street Theater which induced the burlesque show companies not to play or give their attractions in it. What the defendants did was open and above board. They simply said to the owners of burlesque shows, "If you play or show in the Court Street Theater, you cannot play in the theaters owned, leased, or controlled by us"; and, as before said, we conclude that in adopting that plan and rule and in enforcing it the defendants were acting within their legal rights. The purpose and object of the adoption and enforcement of such rule was to secure financial advantage and profit to the defendants. It was for the purpose of enabling it to make provision by which its theaters should at all times during the theatrical season be occupied with suitable burlesque shows, and, as before suggested, there is no basis for the conclusion or finding that this important corporation was actuated by malice as against the owner of the plaintiff's company in organizing the defendant company and in adopting the rule which it did. Its chief purpose and object was to conduct its business in such fashion so that it would be successful and yield a profit to its stockholders and a reasonable return for the money and property which they had invested therein. We, however, understand the law to be that, if the means employed to do a certain act are legal and lawful, it is of no consequence that the motive which induced such act was malicious. Park & Sons Co. v. National Druggists, 175 N. Y. 20, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578; National Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648; Reynolds v. Plumbers' Protective Ass'n, 30 Misc. Rep. 709, 63 N. Y. Supp. 303, affirmed 53 App. Div. 650, 66 N. Y. Supp. 1142.

It, however, is suggested that the defendant company and its directors, Kernan and Rife, are liable to the plaintiff in this action because they conspired to bring about the ruin of the Court Street Theater. The only conspiracy existing, if any, suggested by the evidence, is that they agreed among themselves and devised ways and means by which competitors in the city of Buffalo might be eliminated, and

it was proposed that such result should be accomplished, if at all, only by legal means, to wit, by saying to the owners of the burlesque shows whom the defendants desired to employ, "If you desire to secure employment with us, you must refrain from rendering like service to the plaintiff company or play in its theater in the city of Buffalo." If the defendants only did in the premises what they had a legal right to do, then no cause of action was created in favor of the Court Street Theater Company. National Prot. Ass'n v. Cumming, supra; Foster v. Retail Clerks, 39 Misc. Rep. 48, 78 N. Y. Supp. 860; Hutchins v. Hutchins, 7 Hill, 104; Wehle v. Conner, 83 N. Y. 231; Brackett v. Griswold, 112 N. Y. 454, 20 N. E. 376; People ex rel. Burnham v. Flynn, 114 App. Div. 581, 100 N. Y. Supp. 31. The acts which are complained of as having been done by the defendant company were clearly for the financial advantage of the members of such corporation, and therefore the defendants had a right to give force and effect to such plan of action, notwithstanding it resulted in loss and damage to the Court Street Theater Company. A man may do or perform such legal acts as will result in advantage to him, and, having done and performed them with that end in view, it is unimportant that he may also be actuated by malice, and a desire to injure another. Park & Sons Co. v. National Druggists, 175 N. Y. 20, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578.

The conclusion is reached that under the decisions of the Court of Appeals and of the other courts in this state there is no authority for holding upon the evidence in this case that the defendant company or its directors, either or any of them, are liable to the Court Street Theater Company, or its receiver, because of any of the acts complained of, notwithstanding such action on their part resulted in serious damage and loss to the plaintiff company. Having reached such conclusion, it is unnecessary to consider the other questions presented by this appeal, except to say that I fully agree with Brother SPRING in holding that in any event the damages awarded by the jury in this case are excessive.

The judgment and order appealed from should be reversed and a new trial granted, with costs to the appellants to abide the event.

Judgment and order reversed and new trial ordered, with costs to appellants to abide event. All concur, SPRING, J., in a separate opinion.

SPRING, J. (concurring). I agree with my associates that the judgment in this case should be reversed, but do not assent to the grounds upon which the decision is to be based.

The Court Street Theater, located in the city of Buffalo, had been in operation since 1895. It had been managed by one Wegefarth, and the stock of the company was owned by him and his wife. The Wegefarths also carried on a theater in Baltimore and one in the city of Washington. In September, 1901, the Wegefarths sold all their stock in the Court Street Theater Corporation to Alphonse J. Meyer. There were booked and contracts made for the season of 1901–02 about 20 burlesque companies each to run for one week, and several for a return trip of a week during the sea-

son. The Empire Circuit Company was engaged in booking burlesque companies for eight or nine theaters which were upon its list and also· for some others not within its wheel or circuit. It was an important combination directly or indirectly regulating the burlesque shows in many cities. Any burlesque company was largely curtailed in its list of performances unless booked to some extent by the circuit company. The defendants Kernan and Rife were directors of this company, and were prominent in the management of its affairs. Kernan owned a vaudeville theater in Washington, one in Baltimore, and he and Rife the Lafayette Theater, one of like class in the city of Buffalo. The Wegefarth Theaters in the first two cities and the Court Street Theater in Buffalo were active competitors of the three named under the management of Kernan and Rife. In the fall of 1901 the defendants induced each of the companies listed for exhibition at the Court Street Theater during the ensuing season to cancel their respective contracts. The result of this action was to deprive the Court Street Theater Company of these advertised shows, and the Empire Circuit Company so extensively controlled the companies of this class that satisfactory substitutions could not be made, and the business was conducted at a loss and a receivership soon followed. This action was commenced charging the defendants with conspiring to destroy the business of the Court Street Company, and that the cancellation of these contracts was wantonly and maliciously accomplished by the defendants with the unlawful purpose to destroy or break the Court Street Theater Company.

I think the jury were justified in finding that the charges contained in the complaint were sustained by the evidence. A meeting was held in Pittsburgh, Pa., in November, 1901, consisting chiefly of those operating theaters within the wheel or circuit of the defendant company with others who obtained some attractions through it. Meyer attended this gathering, and learned of the cancellation of the contracts affecting his business. He remonstrated with Rife and Kernan, who were present representing the defendant company, and was advised that they proposed to break or destroy the Court Street Theater Company, and that there would be no burlesque entertainments for it after December 9th. The reason assigned for this position was that the Wegefarths had opened theaters in Baltimore and Washington. Meyer insisted that he was not responsible for Wegefarth's conduct, but the excuse was not accepted. These defendants repeatedly stated that they intended to destroy the Court Street Theater Company. They went at this scheme in a systematic manner. They wrote letters to the various burlesque companies and distributed circulars among all those likely to play at the Court Street Theater to the effect that, if these companies expected to be booked by the Circuit Company, they must not show at the Court Street Theater. This threat was made persistently, and the jury was justified in finding that the companies were coerced into breaking these contracts. The burlesque shows could not withstand the demands of the dominating combination in the vaudeville theater business. For instance, the burlesque show of Rice &

Barton was playing in Pittsburgh when the November meeting called by the defendants was in progress in that city, and one of their managers was summoned before the meeting. The defendant Rife, as he testified, "wanted to know if I would cancel the Court Street Theater in Buffalo, and I told him I thought it would bring on litigation and so forth, and they said, 'We will take care of that. Will you do it?' I said: 'I will have to do what you gentlemen say, or I won't have no show.'" The Rice & Barton Company were booked with the Court Street Theater Company for the week of February 10, 1901. This company was not provided for by the defendants for that week. It secured its own places of entertainments, and it was not on the Empire Circuit until the following season, and that was true of other companies whose contracts were canceled. The object of the November meeting was not to arrange for the pending season. The companies had booked for that season long before. The plan was to arrange for the season of 1902–03. The companies which had agreed to play in the Court Street Theater for 1901–02, and whose contracts were canceled, made engagements with other theater companies not under the control of the defendants. Those engagements for the season of 1901–02 were not canceled. The cancellation was limited to the Court Street Theater. The jury may have found that the termination of these contracts was not for the purpose of enabling the defendants the better to carry on their business. The booking of the Lafayette Company was completed in August, 1901, before the cancellation of any of these contracts with the Court Street Company. Of the 20 companies under contract with the Court Street Theater Company only 5 played in the Lafayette Theater during the season. Nor were these burlesque attractions forbidden to play for other companies outside of the pale of the Circuit Company. The prohibition was confined to the Court Street Theater Company.

Undoubtedly the Empire Circuit Company, in order to develop its business, had the right to insist that no company which played in the competing theater would be included in its list. If that policy resulted to the injury or even the ruin of the Court Street Theater Company, no cause of action would lie against the defendants. Legitimate competition often brings disaster to one or both of the rivals. The court in his charge made the distinction plain to the jury. He distinctly stated that no recovery could be had unless they found that the defendants wantonly, unlawfully, and with express malice to the Court Street Theater Company induced the cancellation of these contracts. He said:

"So that in the conclusion of this case you have these particular questions to determine. If you believe the purpose of the defendants was to injure the plaintiff in his business without any design or intention to legitimately advance their own interest, then it is actionable, and the plaintiff in this action may recover. If you believe that the defendants maliciously procured the breach of the contracts for the purpose of destroying the plaintiff's business and injuring him, then the plaintiff is entitled to recover. If you believe that the defendants wrongfully procured and induced the parties who were booked at plaintiff's theater to break their contracts and refuse to play there, then the plaintiff can recover. If you believe that the arrangement between the Empire Circuit Company and the Traveling Managers' Association was not to pro-

tect themselves against legitimate competition, but malicious interference intended to damage the plaintiff, then the plaintiff may recover. If you believe, however, from all the testimony of the defendants that they did not cause or induce the Traveling Managers' Association to break their contracts with the Court Street Theater, then the plaintiff cannot recover, and your verdict must be one of no cause of action."

At the request of the defendants' counsel, the court further charged as follows:

"It is the law that either corporation has the right to enjoy the fruits and advantages of its own enterprise and credit, and it has no right to be protected against competition, but has the right to be free from malice and wanton interference, disturbance, and annoyance. If disturbance or loss comes as a result of competition or the exercise of like rights by others, it is a damage without legal remedy."

It must be kept in mind that the action is conspiracy, the essence of which is to accomplish an unlawful purpose or a lawful purpose by wrongful means. The element of fraud is an ingredient of the cause of action. We must assume, therefore, that the defendants, for the purpose of ruining the Court Street Theater Company, induced the cancellation of these agreements by threats and coercion. In view of the verdict, they were not engaged in lawful competition. They were not seeking to terminate these contracts for their own business advantage. The primary purpose was the extinction of the Court Street Theater Company. They did not take over all the companies whose connection with the Court Street Theater they required to be severed. Not until after the full life of the contracts had expired were they put on the list of the appellant company.

The leading case relied upon by the appellants is Ashley v. Dixon, 48 N. Y. 430, 8 Am. Rep. 559. One Patrick agreed in writing to sell land to one McEachron. McEachron agreed to sell to the defendant. Subsequently the defendant offered a larger price to Patrick, who was induced thereby not to perform his agreement with McEachron and convey to the defendant. McEachron's executors sued the defendants, charging conspiracy, and recovered. The court held that the judgment could not be sustained "because there was not sufficient proof of such a conspiracy, and the motion to nonsuit the plaintiffs should have been granted. There was no evidence which would warrant the jury to find that Patrick absented himself from home, or refused to perform his contract with McEachron, at the instigation of the defendant." This statement might have ended all discussion for nothing else was necessary. The court added, however, that merely inducing Patrick to break his contract would not make the defendant liable in damages. Fraud or misrepresentation must be shown. There was an entire absence of proof showing any fraudulent misconduct. Patrick was not threatened or coerced into selling his land to the defendant. He received a better price, I assume, than McEachron agreed to pay, and the defendant purchased cheaper than he was under contract to pay McEachron. In the present case the jury have found on evidence warranting it that the defendants wrongfully and fraudulently induced the cancellation of the contracts. The facts in the two cases are radically different. I have not been able to find any authority for the prop-

osition that where men by concerted action maliciously destroy the business of another they are not liable in damages to him. Men may combine to do a lawful act. They may possibly enter into a conspiracy to do such an act, and its consummation may not be attended by any legal liability in damages to the person injured. I do not, however, understand that they may form a conspiracy with the avowed purpose of destroying the business of another, and carry out that scheme, and escape liability for the injuries which they have unlawfully accomplished. As I view it, that would not be a lawful act. If the combination is for an innocent purpose, I assume it cannot be diverted from its legitimate channels for the distinct purposes of ruining another's business, and be immune from liability. Competition is one thing; a scheme systematically developed to injure one's business is quite another. Freedom of contract is one of the inviolable rights maintained by the courts to the fullest degree compatible with public policy. Malicious attempts leading to the violation of contracts to the injury of the parties to it are illegal, and will not be tolerated. Beattie v. Callaman, 82 App. Div. 7, 81 N. Y. Supp. 413; Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496; Jacobs v. Cohen, 183 N. Y. 211, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 730; Rice v. Manley, 66 N. Y. 82, 23 Am. Rep. 30. It is not claimed that the Empire Circuit Company was organized for the purpose of destroying the Court Street Theater Company as a rival in the burlesque show business. It was organized and carried on generally for legitimate purposes. The claim is that its managers did maliciously single out the Court Street Theater Company as the point of attack in order to destroy it. No such warfare was carried on against other companies. Burlesque companies booking with the Empire Company were not required to pass by the other theaters not on the list of that company. The ban was against the Court Street Theater alone. Mr. Swope testified as follows on this subject:

"I did not play the engagement at the Court Street Theater that my contract called for. I never played at the Court Street Theater after the Pittsburg meeting. Our company became a member of the Empire Circuit wheel for the season of 1902 and 1903, and played in that wheel under the Empire Circuit bookings. We did not cancel any other contracts that existed with any other theaters for the season of 1901 and 1902. That is all we were asked to cancel. The others were carried out, I think."

Nor was it necessary to make this complete prohibition to secure business. There were 41 of these companies, and they could exhibit in the aggregate over 1,600 weeks in a year if each company was limited to 40 weeks. At most, the Empire Circuit Company managed 10 theaters which meant 400 weeks of entertainments in the year, and with their listing companies not one-half the time of all these burlesque companies could be taken up. It is also to be observed that, when the scheme for the destruction of the Court Street Theater ripened into a systematic conspiracy, all the bookings for that season had been made by both of these companies; and yet every company listed by the Court Street Company was coerced into canceling its engagement. The finding of the jury here is that the purpose of these defendants was not to enhance their business, but deliberately and wantonly, and

with malicious design to ruin the Court Street Theater. I think the plaintiff established the cause of action alleged in the complaint.

I am, however, in favor of a new trial, as it seems to me the damages awarded are largely disproportionate to the injuries sustained. Meyer paid for the $44,000 of par value stock $12,500. He purchased in September, 1901, and in six months the company was insolvent. He did not own the theater building, simply holding it by lease. There were 18 or 20 burlesque companies whose engagements with the Court Street Theater Company may have been canceled at the instigation of the defendants. The verdict was for $66,750, and it is not probable, even with the most favorable view of the business, that it could have been so profitable as the verdict indicates.

I think the damages are grossly excessive, and for that reason I vote for a new trial.