### GILL ENGRAVING CO. v. DOERR et al.

(District Court, S. D. New York. May 19, 1914.)

1. INJUNCTION (§ 101*) — TEMPORARY INJUNCTION — VIOLATION OF CRIMINAL LAWS.

   That the acts of the officers of a photo engravers' union in warning employers that the members of the union would handle the work of only such customers as had all their engraving done in union shops, and in threatening to strike if work was done for other customers, constituted a crime under Penal Law N. Y. (Consol. Laws, c. 40) § 580, making it a misdemeanor for two or more persons to conspire to prevent another from exercising a lawful trade or calling or doing any other lawful act or to commit any act injurious to trade or commerce, was not ground for injunctive relief pendente lite to the proprietor of a nonunion shop injured

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

by such acts, since injunctions pending suit are more of grace than of right, and penal statutes should be enforced in the criminal courts and not by injunction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 174, 175; Dec. Dig. § 101.*]

2. MONOPOLIES (§ 24*)—REMEDIES OF PRIVATE PERSONS—INJUNCTION.

A private party in his own suit is not entitled to injunctive relief against a conspiracy or combination in violation of General Business Law N. Y. (Consol. Laws, c. 20) § 340, making contracts, agreements, etc., whereby a monopoly in the manufacture, production, or sale of any article or commodity of common use is created, established, or maintained, or whereby competition in the supply or price of any such article is restrained or prevented, or whereby, for the purpose of creating or maintaining a monopoly of the manufacture, production, or sale of any such article, the free pursuit of any lawful business, trade or occupation is restricted or prevented, illegal and void.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

3. MONOPOLIES (§ 10*)—"BOYCOTT"—ILLEGALITY.

The word "boycott" does not necessarily import illegality, and the test is the legality of the object in view and of the means of attainment.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. § 10.*

For other definitions, see Words and Phrases, vol. 1, pp. 855, 856; vol. 8, p. 7592.]

4. INJUNCTION (§ 101*)—STRIKES—LEGALITY OF OBJECT AND MEANS USED.

Where the object of a photo engravers' union and its officers and members, in warning employers that the members would handle the work of only such customers as had all their work done in union shops and in threatening to strike, was to increase the power of the union and get more, better, easier, and better paid work for the members, and not to injure the proprietor of a nonunion shop, though such injury had occurred and was foreseen, and though a part of the motive was hate of such proprietor, the object of the combination and the means employed were legal, and hence gave such proprietor no right to injunctive relief.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 174, 175; Dec. Dig. § 101.*]

5. INJUNCTION (§ 101*)—BOYCOTTS—RIGHT TO RELIEF—DOING EQUITY.

That the proprietor of a photo engraving business, seeking relief against the acts of a labor union claimed to have injured it, had discharged and refused to employ union engravers did not deprive it of the aid of equity.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 174, 175; Dec. Dig. § 101.*]

In Equity. Suit by the Gill Engraving Company against William Doerr, individually and as business agent of the New York Photo-Engravers' Union No. 1, and others. On motion for an injunction pendente lite. Motion denied.

Walter Gordon Merritt, of New York City, for complainant.

Abram I. Elkus and Joseph M. Proskauer, both of New York City, for defendants.

HOUGH, District Judge. Complainant (hereinafter called "Gill Company") has long conducted a photo-engraving business; i. e., from a photograph or drawing it produces a plate from which a picture or pattern can be printed. The principal use of such engravings is to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

adorn the pages of books, magazines, and the like. It follows that, when complainant's work is finished, it is not useful, or at any rate not ordinarily used, except in conjunction with the services of printers, electrotypers, bookbinders, etc. The united efforts of all these tradesmen produce the completed volume, toward which complainant has then contributed but one item. To carry on its business and produce its share in the book trade the Gill Company employs photo-engravers; i. e., men whose trade qualifies them for membership in Union No. 1.

The defendants may be said to represent and act for Union No. 1. As officers of that union they or some of them have written and spoken, acted, and induced others to act in a manner which is thought to justify the charge of the bill; that they and others have long been guilty of "a combination and conspiracy to prevent the employment at his trade of any photo-engraver in the city of New York who was not a member of Union No. 1." It is further charged that the same persons have also been engaged for years in another combination and conspiracy (contrary to common law and the statutes of New York) to "restrain trade and commerce in the production and sale of photo-engravings within the state of New York," to injure and destroy the Gill Company's "good will, trade, and business," and to prevent that company from competing with other photo-engraving shops in which the members of Union No. 1 are or have been exclusively employed.

These several objects of conspiracy defendants (and others equally active but not within the jurisdiction) are alleged to have pursued with the assistance and co-operation of the Allied Printing Trades Council, an aggregation for purposes of mutual assistance of the unions of all the trades commonly considered as requisite for the preparation and publication of a printed book. This allegation is not sustained. Union No. 1 and the allied council have some officers in common, and some letters have been written on paper of the allied council, but everything proved or admitted to have been done was the act of the photo-engravers as represented by Union No. 1, and not of any other trade organization. There is no proof that printers, bookbinders, etc., have taken any part in the matters producing this suit.

The principal officers of complainant (who are named Gill), and therefore the company itself, have been admittedly distrustful of, if not hostile to, Union No. 1 since about 1898, but the definite history of contest begins in 1907. In April of that year the Gill Company kept an open shop[1] employing about 120 men. Union No. 1 "ordered a strike of all union men employed by complainant, comprising about one-half of its employés; said strike took place * * * and caused complainant great loss and damage."

The immediate causes of the strike in 1907 are stated differently by the contending parties. Undoubtedly one Schwartz was the agent of the union in the matter, and Gill says that Schwartz told him the sole question was the "closed" shop.

[1] A shop is "open" if union and nonunion men are therein employed without discrimination; it is "closed" if either unionism or nonunionism excludes an applicant from employment. Irving v. Joint District Council (C. C.) 180 Fed. 896; Sackett, etc., Co. v. Nat. Ass'n, 61 Misc. Rep. 150, 113 N. Y. Supp. 110.

Schwartz denies that the strike was ordered in an effort to unionize the Gill Company, and alleges that the reason for striking he gave Gill was that his own employés had entered a protest with the union against the employment of an excessive number of apprentices, a number so great that the Gill Company was "looked upon as a school for teaching photo-engraving, a condition that was eminently unfair[2] to organized labor."

As article 4 of the Constitution of Union No. 1 declares that "this union claims the right to regulate the number of persons who may be employed as apprentices," and article 5 of the same document makes the union initiation fee $30 for all who have learned their trade under the jurisdiction of the union and $200 for those who have done so outside said jurisdiction, the difference between Gill's version of the difficulties of 1907 and that of Schwartz would seem to be one of time merely. But the effect of Schwartz's statement (whatever it was) and of the consequent strike on the Gill Company's conduct is thoroughly admitted. From that date to the present the Gill Company has refused to knowingly employ any union worker, has discharged any and every employé who joined the union, and, in short, has refused to recognize, deal with, or encourage Union No. 1 (or any other union) in any way whatever. For seven years the Gill shop has been "closed" in a recognized but unusual sense of that word.

The record is full of reasons for this action on the part of complainant and of assertions by defendants that the Gill Company does not give to its employés the "same scale of wages and the same working conditions as those generally prevailing." This phrase means conditions which respond to the demands of the union, and, when tested by the affidavits submitted, the difference between the Gill shop and a union shop in New York appear to be these: Some of the Gill employés (the most skillful) get more than union wage; the average or ordinary workman gets less; and special time is allowed in union plants for luncheon, which is not the case in the Gill shop. As mediocrity always outnumbers ability, I think it proven that a shop closed to union men has hitherto been cheaper than one exclusively manned by unionists, and that the most obvious result of change is to make mediocrity more expensive.

No change needing comment is shown to have occurred in the relations between these parties from 1907 to 1913. In that year it is admitted that the defendants Doerr and Brady officially addressed communications to customers or persons of influence with customers of the Gill Company, urging that the business of such customers be diverted from complainant to union shops. Doerr also sent out circular letters to friends throughout the land indicating methods by which one large customer of complainant (MacMillan Company) might be coerced into withdrawing patronage from the Gill Company "until such time as it was a union office." MacMillan promptly succumbed, but there is no

---

[2] The words "fair" and "unfair" are frequently used through the pleadings and the affidavits of defendants. The difference between them is the classic distinction between orthodoxy and heterodoxy. "Fair" means what is pleasing to the parties using the word, and "unfair" means whatever they do not like.

evidence to show whether its action was distasteful or gratifying to itself. MacMillan's change of business relations with complainant is evidenced by the following (from a letter to defendant Brady):

"Our manufacturing department has been instructed to withhold any further orders from the Gill Engraving Company for the present; and all future contracts for printing books will contain a proviso that all work coming under the jurisdiction of International Photo-Engravers' Union [3] * * * shall be done in accordance with the scale of wages and conditions of these unions in the locality where the work is done."

Shortly before the defection of MacMillan Company, other fuel, and of a different kind, was added to the flames of contest and hatred.

The men managing the Gill Company owned stock and held office in the Colorplate Company, a concern operating a union shop and doing a special line of engraving work. Mr. Gill deposes that he was told by the Colorplate's president that, unless the Gills severed all connection with that corporation and parted with their stock, "the officers" of Union No. 1 would call a strike. Under this threat the Gills retired, to their loss directly as shareholders and indirectly as owners of the Gill Company; the Colorplate Company having done for them work the main concern was not equipped to do.

This tale, as told by defendants, is that the Colorplate employés were afraid that the Gills would get control and then discharge them, as was being done in the Gill Company, whereupon said employés "unanimously voted that they resign," without "an order on the part of any union officials." The difference between a threatened strike and an announced unanimous intention to resign is that between tweedledum and tweedledee; but the fact that the managers of the Gill Company were recognized and acted against as enemies, by even private members of Union No. 1, is noticeable and admitted.

On the whole, defendants' union seems to have been encouraged by the results of effort during 1913, for in January, 1914, at the annual meeting where these defendants were elected to office, the following report was made, according to the "Official Journal of the International Photo-Engravers Union":

"With the new year this local (i. e., Union No. 1) has taken a pledge to organize 100 per cent., if possible. The prospects seem good. The Gill Engraving Company, which has been the only nonunion concern of any consequence in the past, is dwindling down to such a size as to no longer be a detriment to the many fair minded employers in the city. Their competent men are seeing the wisdom of joining our ranks and the others are being discharged, as the Gill Engraving Company seems to find it difficult to hold its old customers or to replace them with new ones. The plan as laid down by the officials last April has been studiously followed out and will be continued indefinitely in the future or until such time as an amicable agreement is reached with the Gill Engraving Company."

In March of 1914 the action was taken by defendants, which evidently produced this suit, for the history of contest which has been related is not asserted to be of importance, except as it shows intent and may induce the court to draw from acts and occurrences, other-

[3] This "union" is a conference or league of many locals like Union No. 1, and extends over North America.

wise colorless, the same inferences as do complainant's counsel. A meeting was called of representatives of all union shops under the jurisdiction of Union No. 1, and such representatives were instructed that thereafter the shop in which they worked was to do no business for any customer who likewise did business with a nonunion shop. In order to apprise employers as to who were the probable offenders, a list was handed each shop representative, who was to pass it on to his employer. Defendant Doerr reinforced these instructions by sending a letter to each employer running a union shop in New York, stating that after April 1, 1914, their employés would handle the work only of those customers "who will assure us that they will have their engraving done in shops fair to our members. In other words, we will do all of their work or none."

A few days later new lists were furnished of customers who still refused to have all of their photo-engraving work done under "fair" conditions. This list was much smaller than the one first sent out, and it is alleged and not denied that the reduction in size represented a corresponding reduction in the Gill Company's patronage.

It may be important to ascertain whether this weapon of Union No. 1 is or is not leveled directly or especially at the Gill Company. The position of the union has been stated in writing by several defendants, but perhaps the letter of one Volz (not a defendant, but a vice president and acting with defendants) is most instructive. On March 30, 1914, Volz declares that the union is going to carry out certain of its rights. Though he complains of the Gill Company, the rights that are to be enforced consist in refusing "to do any part of the engraving for any magazine, etc., made in whole or in part by any concern where our members are unjustly discriminated against; * * * all photo-engravings for any publication or concern will be produced either under fair conditions or all under unfair conditions. We refuse to assist publications unfair to our members."

Thus (according to Volz) the war declared is on a class, not any one person, unless that person is sui generis. This is exactly what the Gill Company says it is, viz., the only considerable nonunion commercial photo-engraving shop in New York, the only concern whose customers would be likely to have more work than one shop could always do, and therefore (by a process of exclusion) the sole object of the union's hostility, and the only business affected by the order apparently leveled against "unfair conditions" generally.

On this point there has been some conflict, and 13 nonunion shops are enumerated by defendants. Several of these are noncommercial (i. e., doing special work only for one customer), and the rest are so small that the substantial correctness of the statement (above quoted) of the union's newspaper seems proved, viz., that the Gill Company is the "only nonunion concern of any consequence."

Defendant Brady has signed an affidavit (probably drawn after a perusal of reported cases) in which he thus states the purpose and intent of the union's order:

"Publishers who have the substantial part of their work done in anti-union shops, which do not conform to the union scale of wages and hours, do not

compete on terms of equality with those publishers who have their work done in shops where union labor is employed and which conform to the union scale of wages and hours. The refusal of the members of the union to perform for publishers that portion of the work which they desire to have performed by members of the union, unless said publishers should send the entire job into shops where members of the union are employed and which conform to the union scale of wages and hours, was intended as an effort to obtain for the members of the union the work of the entire job or jobs of such publishers, and the effect, if any, on the Gill Engraving Company is merely incidental."

It is believed the foregoing covers the whole evidence; there is almost no contradiction as to physical facts; in result it stands admitted that defendants have in concert, as the result of premeditation, by agreement with each other and with persons not parties to this suit, as the representatives of Union No. 1 and by and through their power as such representatives, procured and caused the workmen belonging to their union, being 75 per cent. of the journeymen photo-engravers in New York, exclusively manning every considerable commercial shop in that city, to concertedly refuse to do work for any customer of their several employers who will not agree to patronize exclusively union photo-engravers. These acts have destroyed much of complainant's business and threaten the rest.

As to the purpose with which defendants have acted, I am of opinion that hostility to Gill Company is subordinate and incidental. All nonunion businesses are treated alike; naturally the greater the business the greater the aggregate dislike, but the quality of hatred is the same, irrespective of size. That Gill Company is hurt is gratifying but incidental; the procedure would be the same were complainant nonexistent. The priest of Juggernaut may be glad that the car rolls over a personal enemy, but the car rolls primarily to glorify the god within. Of course defendants well knew that their plan of campaign would injure Gill Company; they intended to injure anybody who got in their way and they knew complainant was there; nevertheless the ultimate purpose, the causa causans, of defendants' action was deeper and more far-reaching than merely to injure one business. Doerr told nearly the whole truth when he wrote, "We will do all of (your customers') work or none." If he had added "and if they can get it done otherwise after this we will think up something else," he would have told the whole truth, because the great and all-absorbing object of defendants' endeavors was and is to get all the work in the trade, or at any rate all the work worth having, for their own members. This finding of ultimate purpose completes my view of the facts. As to the physical acts and words of the parties, it may again be said there is no conflict worthy the name, but as to the mental facts, as to inferences of intent, men will differ widely, just as a jury would probably disagree on such a subject. This renders the study of motive important, for motive begets intent, as has often been observed by writers on criminal law.

What motive incited defendants to injure Gill Company? None, except that it hinders the expansion and aggrandizement of the union, and therefore gives rise to the same kind of objection that the soldier has to the man who prevents his onward march. It can rarely be said

that the soldier is moved by a desire to kill his opponent, but he will kill him if necessary.

Before applying the law to the findings of fact, much that was mentioned in argument may be laid aside. It is not shown that any national statute has been violated; nor that any principle peculiar to national law (e. g., interstate commerce) is concerned; nor that the question presented is complicated by disturbance of the peace, physical trespass, or violence; nor that any government function (e. g., mail transportation) has been interfered with. These exclusions make the case purely local. The jurisdiction of this court is an incident, depending on the New Jersey incorporation of a business wholly conducted in New York City. Therefore I think it desirable that the law of New York should be applied so far as I am capable of discovering it, unless the decisions of federal courts superior to this compel different treatment.

[1] It is asserted that the defendant's acts constitute a crime under New York Penal Code, § 580. I decline to consider such violation as ground for injunctive relief pendente lite. Let it be admitted that under Kellogg v. Sowerby, 190 N. Y. 370, 83 N. E. 47, a civil suit will lie against a person committing a crime by one who is injured through the commission thereof, and that on final hearing, and after a full presentation of testimony, authority might compel the issuance of an injunction; but injunctions pending suit are more of grace than of right. I am sure that penal statutes are meant to be enforced in criminal courts; their use as bases for injunction is usually illegitimate and always illogical; even the not infrequent fact that prosecuting officers do not enforce the statute against some citizens and rigidly enforce it against others does not justify an attempted administration of criminal law by courts of equity.

[2, 3] It is further urged that the defendants have engaged in a conspiracy or combination in violation of sections 340, 341, General Business Law of New York (the Donnelly Act). It seems plain enough that this is true, but it is settled that for such cause a private party in his own suit is not entitled to injunctive relief. Irving v. Neal (D. C.) 209 Fed. 471; Paine Lumber Co. v. Neal (U. S. D. C. November, 1913) 212 Fed. 259, affirmed in 214 Fed. 82, 130 C. C. A. ——, April 7, 1914. Therefore this motion is to be decided by what is usually called common law; i. e., the law of New York as evidenced by the decisions of its courts, supplemented only by the inquiry as to whether any controlling divergence of opinion is found in the appellate tribunals to which this court is more directly responsible. There will also be disregarded much argument resting on the statement that defendants have produced a boycott. In common parlance, a boycott has been attempted or created. But the word is of vague signification, and no accurate and exclusive definition has, so far as I know, ever been given.[4]

Nor does it advance matters to call the affair a boycott, for "it cannot be said that to boycott is to offend the law." Mills v. U. S. Printing Co., 99 App. Div. 611, 91 N. Y. Supp. 185, affirmed in 199 N. Y.

4 See a collection in Joyce on Monopolies, c. 3.

76, 92 N. E. 214. This is not thought to mean that every form of boy-cotting is lawful, but that the word does not necessarily import illegality. I do not perceive any distinction upon which a legal difference of treatment should be based between a lockout, a strike, and a boycott. They often look very unlike, but this litigation illustrates their basic identity. All are voluntary abstentions from acts, which normal persons' usually perform for mutual benefit; in all the reason for such abstention is a determination to conquer and attain desire by proving that the endurance of the attack will outlast the resistance of the defense; and for all the law of New York provides the same test, viz., to inquire into the legality (1) of the object in view, and (2) of the means of attainment. When courts generally (with some legislative assistance from behind) abandoned the doctrine that any concerted arrangement which hindered the following of a trade or constituted an attempt to change trade conditions (especially wages) amounted to an actionable conspiracy, this judicial position was quite sure to follow, unless it was admitted that the passing of the old doctrine had left the matter political rather than judicial. This has not yet been done.

It was easy to find out whether a man was hindered, if, as matter of law, the court held the hindering criminal (Rex v. Eccles, 1 Lea, C. C. 274); it has not been found so easy to fix any responsibility when a mere result is no longer sufficient to warrant judgment.[5] The leading cases in New York (Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496; National Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648; Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. [N. S.] 292, 111 Am. St. Rep. 730, 5 Ann. Cas. 280; Park Co. v. National Druggists, 175 N. Y. 40, 67 N. E. 136, 62 L. R. A. 632, 96 Am. St. Rep. 578; McCord v. Thompson-Starrett Co., 129 App. Div. 130, 113 N. Y. Supp. 385, affirmed in 198 N. Y. 587, 92 N. E. 1090; Mills v. U. S. Printing Co., supra) all show that the court sits primarily to decide a question of fact, viz.: What is the object of the combination? The conflicting opinions in the Cumming Case illustrate this perfectly. Parker, C. J., for the court, declared:

"There is no pretense that the defendant associations * * * had 'any other motive than one, which the law justifies of attempting to benefit their members by securing their employment." There is not "even a hint that a strike was ordered or a notification given of the intention to order a strike for the purpose of accomplishing any other result than that of securing the

---

[5] To parade the cases bearing on such controversies as this is useless, for reconciliation is impossible. Very different viewpoints are afforded by the publications below enumerated. The historical development of the law is admirably stated by Mr. James Wallace Bryan in Johns Hopkins University Studies, series 27, Nos. 3–5 (1909). The American cases to 1908 are critically collated by Mr. Walter G. Merritt in his pamphlet entitled "Limitations on the Right to Strike." The University of Wisconsin's Bulletins on Boycotting and Blacklisting '(1906) are endeavors to state impartially results to date. "Boycotts and the Labor Struggle" (H. W. Laidler, 1913), while not a conventional law book, tabulates the confusion of cases, and is especially full in respect of New York. I venture to think that Justice Holmes' article on "Privilege, Malice, and Intent" (8 Harv. L. Rev. 1894) is still the clearest exposition of fundamentals.

discharge of the members of the plaintiff association and the substitution of members of the defendant associations in their place. Such a purpose is not illegal."

Whereas Vann, J., for the minority, stated:

"The object of the defendants was not to get higher wages, shorter hours, or better terms, for themselves, but to prevent others from following their lawful calling."

And this was the point of acute difference in a court which could not make any findings of fact of its own. The learned judges could not even agree as to the meaning of the findings of the lower court.[6] The English courts devote themselves to deciding the same questions of fact, and find it no easier. Cf. the opinions of Lord Shand in Allen v. Flood, L. R. 1898, A. C. 1, and Quinn v. Leathem, infra.

[4] Applying this rule to this case, it is held that the object of defendant's combination is not to injure Gill Company, though such injury has occurred and was foreseen. The object is to increase the power of the union, so as to get more, better, easier, and better paid work for its members; this is now regarded as laudable.

As to the means employed, everything lately done and alleged as ground for present action consists in threatening strikes. This is the exercise of a legal right. If defendants have sought to attain a legal end by legal means, that a motive, or part of a motive, was hate of Gill Company is immaterial. Roseneau v. Empire Circuit Co., 131 App. Div. 435, 115 N. Y. Supp. 511; Quinn v. Leathem, L. R. 1901, A. C., at 538.

That wrong and injury are being done in this matter is plain enough. Why does the law refuse or neglect to correct it? Andrews, J., has, I think, given the best answer in Foster v. Retail Clerks' Ass'n, 39 Misc. Rep. 48, 78 N. Y. Supp. 860:

"Injury * * * is never good, but to suffer it may entail less evil than to attempt to check it by legal means. * * * In the last analysis this freedom to commit injury, and the bounds imposed upon it are regulated by what has been thought to be public policy."

The cases cited could be used to show that no bounds have been imposed in New York on wrongs quite as great as that wrought upon complainant.

[5] Defendants have called attention to one fact not found in any case known or shown to me. The Gill Company has declared war on the union by discharging all members found in its shop. It is said this should deprive complainant of the aid of equity, and Sinsheimer v. United Garment Workers, 77 Hun, 215, 28 N. Y. Supp. 321, is relied on. It is not seen why a person otherwise entitled to protection for

---

[6] Compare Newton Co. v. Erickson (1911) 70 Misc. Rep. 291, 126 N. Y. Supp. 949, and Bossert v. United Brotherhood (1912) 77 Misc. Rep. 592, 137 N. Y. Supp. 321, for similar difference between trial courts. Justice Holmes wrote in 1894: "The ground of decision really comes down to a proposition of policy of rather a delicate nature concerning the merit of the particular benefit to themselves intended by the defendants, and suggests a doubt whether judges with different economic sympathies might not decide such a case differently when brought face to face with the issue." This was prophetic for New York at least.

his business is deprived of it because he will not employ a certain class of workmen; the nonpreferred workmen are not, therefore, given any right to injure the man who does not prefer them.

In the United States Courts for this circuit, National Fireproofing Co. v. Mason Builders' Ass'n, 169 Fed. 259, 94 C. C. A. 535, 26 L. R. A. (N. S.) 148, is controlling. It accepts the New York cases fully, piously regrets the injuries committed, and writes the epitaph of litigation such as this by declaring that, when equal legal rights clash, equity is helpless. This is true; it would have been just as true to point out that the result of legalizing strikes, lockouts, and boycotts under any circumstances must be that those who understand the use of such legal tools can always keep within the law and accomplish their main purpose while inflicting all necessary "incidental" injury.

Considering that the rules as laid down in New York have not been shown to be transgressed, motion denied.