ÆOLIAN CO. et al. v. FISCHER et al.

District Court, S. D. New York.   October 8, 1929.

upon motion for a preliminary injunction, that the defendants did not conspire to exclude plaintiffs' organs from interstate trade or commerce, but only to coerce the employment of union organ workers by persuading members of other crafts to refuse to work in or upon the same building with plaintiffs' nonunion organ workers. In the Circuit Court of Appeals [29 F.(2d) 679, 680], it was said that the indirect result of this might be to impede the sale of plaintiffs' organs within this territory, but that such indirect interference with interstate commerce is not within the prohibition of the Anti-Trust Act, and in support of this statement Industrial Ass'n v. United States, 268 U. S. 64, 77, 45 S. Ct. 403, 69 L. Ed. 849, and United Mine Workers v. Coronado Co., 259 U. S. 344, 411, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762, were cited. But the court added: "Therefore the appellants must establish, if they would show themselves entitled to an injunction under the Federal Statutes, that the work of setting up their organs in New York or New Jersey—such work being what the defendants seek to monopolize—is itself interstate commerce because part of the interstate commerce involved in sending the organ from another state."

This question is quite clearly answered by the proofs upon final hearing, from which it appears that all of the plaintiffs, with one exception, maintain organ factories outside of this state and in the conduct of their business enter into contracts for the sale and installation of organs in buildings within the state. All of the essential parts of the organ are made in the factory, with the exception of the flues leading from the air pump to the air box or chamber. Some of the parts are temporarily assembled before shipment and are tested in the factory. But shipment is then made of the separate parts, to be installed in the premises of the purchaser. The agreement of the organ manufacturer to install is not only relevant and appropriate to the interstate sale, but is essential if an organ, as distinguished from its parts, may be sold at all. The thing sold is a musical instrument, complete in itself. The unassembled pipes, wind box, motor, console, flues, and intricate wiring cables which are shipped from the factory, are not the subject-matter of the sale, and the sale is not completed until all these parts have been installed with proper relation to one another and many intricate electrical connections have been made and adjusted so that the whole will function as a delicately tuned musical instrument. Without descending to

Pavey & Higgins, of New York City (James C. Higgins, of New York City, of counsel), for plaintiffs.

James E. Smith, of New York City, for defendants.

THACHER, District Judge (after stating the facts as above). It is entirely clear from the proofs upon final hearing, as it was

mechanical description, it may be said that the work of installation is of the most vital importance in the construction of the completed organ, and requires in its performance not only the highest mechanical skill, but a thorough understanding of the methods employed by the manufacturer in the arrangement of mechanical and electrical connections. It is more than appropriate that the manufacturer undertake this work. Without doubt he must do so if he wishes to dispose of his product at all. In order to do so, the plaintiffs maintain local organizations of skilled workmen who are engaged in the work of installation. The facts presented upon final hearing remove the necessity of drawing fine distinctions between the lightning rod, signal switch, and bridge construction cases, on the one hand, and the picture frame and ice machine cases on the other, which are cited in the opinion of the Circuit Court of Appeals. Whatever distinctions may be drawn in doubtful cases, it is clear that the instant case is governed and controlled by the decision in the ice machine case. York Mfg. Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611. The distinction there drawn between the setting up of lightning rods (Browning v. Waycross, 233 U. S. 16, 34 S. Ct. 578, 58 L. Ed. 828) and the installation of an ice machine shows that the contracts here in question for the construction and installation of organs clearly involve interstate commerce not only in the manufacture and shipment of the organ, but in its installation after arrival within the state.

But from this conclusion it does not necessarily follow that the defendant unions, desirous of procuring for the union organ workers all of the local work of installation, may not consistently with federal statutes combine, and in combination refuse to work in and upon buildings where such work is performed by nonunion organ workers. In the pursuit of this local object it is true that defendants have interfered with plaintiffs' performance of contracts involving interstate commerce, but not more directly than would the strike of its factory employees accompanied by illegal picketing and intimidation intended to prevent others from taking up their work in connection with the manufacture of the same organs. Such a combination would not violate the federal statute because its effect upon interstate commerce would be indirect and incidental to the purely local purpose, by group action, to prevent the employment of nonunion labor in the manufacture of goods under contracts for delivery in interstate commerce. United Leather Workers v. Herkert & Meisel Trunk Co., 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566. The decisive fact being the character of the restraint imposed, no basis for decision can be found in distinctions drawn between the local work of manufacture, in the state of origin, and the local work of installation in the state of destination. The installation of the organ is quite as essentially local as building, manufacturing, mining, or growing crops. Industrial Ass'n v. United States, 268 U. S. 64, 82, 45 S. Ct. 403, 69 L. Ed. 849. The purpose with which men refuse to work or persuade others to do so must therefore control decision. If the purpose be to add strength to their union merely by refusing and persuading others to refuse to work with nonunion men, the restraint upon the performance of contracts involving interstate commerce is incidental and indirect, and this is quite as truly the effect whether their employment is the preparation of goods for interstate shipment or the installation of machinery after shipment is completed. The rule defining illegal combinations of workmen employed in each of these tasks, when judged from the standpoint of commercial restraint, must be the same. Industrial Ass'n v. United States, supra. In the latter case it was said (268 U. S. 82, 45 S. Ct. 407):

"If an executed agreement to strike, with the object and effect of closing down a mine or a factory, by preventing the employment of necessary workmen, the indirect result of which is that the sale and shipment of goods and products in interstate commerce is prevented or diminished, is not an unlawful restraint of such commerce, it cannot consistently be held otherwise in respect of an agreement and combination of employers or others to frustrate a strike and defeat the strikers by keeping essential domestic building materials out of their hands and the hands of their sympathizers, because the means employed, whether lawful or unlawful, produce a like indirect result. The alleged conspiracy and the acts here complained of, spent their intended and direct force upon a local situation—for building is as essentially local as mining, manufacturing or growing crops—and if, by a resulting diminution of the commercial demand, interstate trade was curtailed either generally or in specific instances, that was a fortuitous consequence so remote and indirect as plainly to cause it to fall outside the reach of the Sherman Act."

The vital difference under the Sherman Act "between a direct, substantial, and in-

tentional interference with interstate commerce and an interference which is incidental, indirect, remote, and outside the purposes of those causing it," was said in that case to be clearly illustrated by the decisions in United Mine Workers v. Coronado Co., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762, United Leather Workers v. Herkert & Meisel Trunk Co., supra, and Industrial Ass'n v. United States, supra, on the one hand, and Loewe v. Lawlor, 208 U. S. 274, 28 S. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, and Duplex Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, on the other. See, also, Bedford Co. v. Stone Cutters' Ass'n, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791. But in the latter cases "the object of the labor organizations was sought to be attained by a country-wide boycott of the employer's goods for the direct purpose of preventing their sale and transportation in interstate commerce in order to force a compliance with their demands."

The distinction thus so sharply drawn in Industrial Ass'n v. United States, and so clearly applied in the United Leather Workers' Case, is controlling here, and I am constrained to conclude that the collective refusal of local workmen to work either upon or in the same building where nonunion workmen are employed in the installation of plaintiffs' organs was at most an incidental, indirect, remote restraint upon interstate commerce, which was entirely outside of the purposes sought to be accomplished; i. e., the local employment of union labor in such work.

Basing federal jurisdiction upon diversity of citizenship, plaintiffs claim that they are entitled to relief under state law. As stated upon denial of the motion for preliminary injunction [27 F.(2d) 560], decision turns upon whether the defendants and those who co-operated with them were justified in what they did by honest motives to advance self-interest, or were moved by malicious intent to injure the business and good will of the plaintiffs. Exchange Bakery & Restaurant, Inc., v. Rifkin, 245 N. Y. 260, 157 N. E. 130; Interborough Rapid Transit Co. v. Lavin, 247 N. Y. 65, 159 N. E. 863; Nat'l Fireproofing Co. v. Mason Builders' Ass'n, 169 F. 259, 26 L. R. A. (N. S.) 148 (C. C. A. 2d). Refusal by the members of a craft to work, either upon nonunion products or with nonunion men, in order to procure for themselves or for those associated with them in the same craft all work in which the craft is engaged, is not actionable if injury results to the employer of nonunion men. Bossert v. Dhuy, 221 N. Y. 342, 117 N. E. 582, Ann. Cas. 1918D, 661; Nat'l Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648; Paine Lumber Co. v. Neal, 244 U. S. 459, 471, 37 S. Ct. 718, 61 L. Ed. 1256; Gill Engraving Co. v. Doerr (D. C.) 214 F. 111. In Duplex Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, the majority of the court gave no consideration to the common law, but, in a dissenting opinion by Brandeis, J., in which two members of the court concurred, the modern development of the common law on this subject was carefully considered. From this consideration of the law it will be seen that the conception of self-interest sufficient to justify group action in refusing to work has expanded with the growth of organized industry in recognition of changing conditions which have warranted the extension of justifiable collective action by organized labor groups in refusing to work under conditions prejudicial to the interests of the group. Nor are the efforts of the group illegal when extended beyond the employment of its members to conditions affecting the employment of others in the same trade or business. Exchange Bakery & Restaurant, Inc., v. Rifkin, supra. In the case at bar it cannot be said that the members of the allied crafts who refused to work on the construction of buildings or in theaters where plaintiffs' nonunion men were at work were not influenced by justifiable self-interest in their collective action. If it be lawful, as seems to be plainly implied in the Bakery Case, to attempt to unionize, by collective refusal to work, the various trades engaged in a large industrial plant and in all plants in the same industry, there can hardly be objection to similar efforts to unionize all the trades at work on a building in course of construction or in a theater. The employees of different contractors engaged in work on the same building, although belonging to different crafts, have many interests in common arising in connection with the prosecution of the work and the conditions of employment under which it is to be performed, and union men may well refuse to work side by side with nonunion men who are not in sympathy with the aims and purposes of their organization. The situation is much the same in a theater or on any other premises where the presence of nonunion men may properly be regarded as a condition of employment unsatisfactory to the members of a union. Such situations are

plainly distinguishable from conditions approaching a general strike, carried on by persons not united by any common interest, as in Auburn Draying Co. v. Wardell, 227 N. Y. 1, 124 N. E. 97, 100, 6 A. L. R. 901. What was condemned in that case was a combination by fear and coercion to compel third persons to refrain from having any business relations with the plaintiff. What the plaintiff's actual and prospective customers feared was not any voluntary self-initiated movement of their own employees to quit, but that they would quit contrary to their own desires and only because they were ordered to do so, and the court was careful to state that the contest did not arise in the ordinary and natural exercise by the unions of the right to control their own labor and of the right of association. Thus the decision in that case comes to this: That, where defendants induce men to quit work by compulsion and coercion, contrary to their own desires and interests, and by threat of such compulsion induce their employers to withdraw their patronage from another, the consequent injury to that other's business is actionable and may be enjoined. No limitation upon the right of association was intended. Indeed, any such limitation was disclaimed, for it was said:

"The rights, in virtue of which the defendants would justify the interference and the injury, are: (a) That of laborers to associate; (b) to bring within the labor organizations as members all laborers; (c) through the coherent and solidified power and influence flowing from association and united efforts to secure for all laborers higher wages, shorter hours, arbitration of labor disputes, and better working conditions. Beyond question those rights exist. Labor unions are, and for a long time have been, recognized by the courts of this country as a legitimate and useful part of the industrial system. Associations of laborers, to accomplish lawful objects by legal means, have been always recognized and protected by the law of this state. The organizations of the defendants were as lawful as the incorporation of the plaintiff. Their members might and should have promoted their strength, welfare, and their intelligent and salutary influence and control. Rights that are lawful and purposes that are useful and just cannot, however, be effectuated and accomplished by unlawful means."

In this case there is no evidence sufficient to justify a finding that the unions whose members refused to work on premises where nonunion organ workers were employed were compelled or coerced to do so against their own desires and interests. On the contrary, these men were themselves unwilling to work with the plaintiffs' nonunion employees. Nor was it in any sense illegal for the Organ Workers' Union, desirous of procuring work for its own members, to call to the attention of other trades engaged in various buildings the presence of nonunion organ workers there, and to persuade them, without coercion or compulsion, to refuse to work side by side with nonunion men. For a court to compel these members of other crafts, against their will, to work on the same premises with other men personally objectionable to them, would be a serious invasion of their right to work for and with whom they please, so long as their right to do so is not collectively exercised with malicious purpose to injure another. The clash of equal rights is obvious, and the plaintiffs, though injured, are without remedy. National Fireproofing Co. v. Mason Builders' Ass'n, supra; Gill Engraving Co. v. Doerr, supra.

The bill must accordingly be dismissed, with costs.