McCORD v. THOMPSON–STARRETT CO. et al.

(Supreme Court, Appellate Division, First Department.   December 11, 1908.)

1. ASSOCIATIONS (§ 13*)—RULES—VALIDITY.

An order of a Building Trades Employers' Association embracing nearly every prominent building contractor of the borough of Manhattan, organized to regulate industrial disputes between its members and their employés, which instructs the members that no men may be set to work or retained at work who do not join a particular labor union, is void as against public policy, since it affects practically the whole building trade in such borough, and a bond given by a member to secure penalties for noncompliance with orders of the association is not breached by a violation thereof.

[Ed. Note.—For other cases, see Associations, Cent. Dig. § 16; Dec. Dig. § 13.*]

2. ASSOCIATIONS (§ 13*)—RULES—ADOPTION.

The constitution of the Building Trades Employers' Association, organized to regulate industrial disputes between its members and their employés, provided for a board of governors with authority to decide disputes and regulate the conduct of its members. A letter instructing the members that no men might be set to work or retained at work who did not join a particular labor union was sent to a member by the board of governors, certified by the secretary. The letter spoke of the emergency committee as making the order, but it did not appear who constituted the committee or what power it possessed. The same letter contained another injunction not purporting to emanate from the committee. *Held*, that the board of governors adopted the orders in the letter, and the association thereby undertook to impose on a member a void obligation.

[Ed. Note.—For other cases, see Associations, Cent. Dig. § 16; Dec. Dig. § 13.*]

3. ASSOCIATIONS (§ 13*)—RULES—VIOLATION—EFFECT.

An association of employers, organized to regulate industrial disputes between its members and their employés, cannot collect the penalty imposed on a member for violating an order of the association, unless the order is one within the power of the association to give.

[Ed. Note.—For other cases, see Associations, Cent. Dig. § 16; Dec. Dig. § 13.*]

4. CONTRACTS (§ 108*)—EMPLOYMENT OF UNION LABOR—VALIDITY.

While an individual employer may lawfully agree with a labor union to employ only its members, yet such an agreement when participated in by a large proportion of employers in any community is contrary to public policy, because it operates generally on the craftsmen in the trade and imposes on them, as a penalty for refusing to join the union, the practical impossibility of obtaining employment at their trade.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 108.*]

Ingraham and Clarke, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by William H. McCord, as president of the Building Trades Employers' Association, against the Thompson-Starrett Company and another. From a judgment of the Trial Term (112 N. Y. Supp. 902) for plaintiff, defendants appeal. Reversed, and new trial granted.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and SCOTT, JJ.

Morgan J. O'Brien, for appellants.
Frederick Hulse, for respondent.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SCOTT, J.   We find no difficulty in affirming this judgment if the Buildings Trades Employers' Association had gone no further than to order a general "lookout" of the members of the Brotherhood of Carpenters.   The communication of September 22, 1904, however, does go further, and instructs the members of the association that no men may be set to work, or retained at work, who do not at once. join a particular labor union, the Greater New York Carpenters' Union.

This requirement, if it is to be considered as the act of the association, was against public policy, illegal, and void (Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496; Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. [N. S.] 292, 111 Am. St. Rep. 730).   I see no reason why we are not bound to regard this requirement as the act of the association.   By its constitution the board of governors is designated as the body which is authorized to act for the association, and to issue orders to the members.   The complaint alleges and the court has found that the letter containing the objectionable order was "sent to said defendant by the said board of governors and certified by its secretary."   It is true that the letter speaks of the emergency committee as directing that all carpenters then in the employ of a member, who are competent, shall become members, at once, of the Greater New York Carpenters' Union, and it does not appear who constitute the emergency committee or what power it possessed.   But the same letter also contains the injunction, not purporting to emanate from the emergency committee, that no brotherhood carpenter, although willing to sign the arbitration plan, may be set to work unless he at once joins the designated union.   Whether these instructions originated with the emergency committee or any one else, the board of governors by causing them to be subscribed by their secretary, and by sending them to the members of the association, adopted them, and made them their own.   In so doing, as it seems to us, they exceeded their lawful authority, and undertook to impose upon the Thompson-Starrett Company an obligation which it was not required to assume.   The bonds sued upon, although purporting to be given to secure liquidated damages, are in fact given to secure penalties for noncompliance with the order of the association, for it is apparent that the association, as such, could suffer no actual pecuniary damage from the disobedience of an order.

To collect a penalty for the disobedience of an order, it must appear that the order was one which was rightfully and lawfully given, and, as it appears that the association exceeded its authority in requiring that no carpenter should be employed unless he joined a particular union, it follows that the penalty cannot be collected.   I do not understand that there is any serious difference of opinion between us as to the illegality of the directions to employ only members of one particular union.   This seems to be established by the opinion of the Court of Appeals in Galen v. Curran, supra, reaffirmed and explained in Jacobs v. Cohen, supra.   In the latter case Judge Gray, writing for the court, makes it quite clear that while an individual employer may lawfully agree with a labor union to employ only its members, because such an agreement is not of an oppressive nature operating generally

throughout the community to prevent craftsmen in the trade from obtaining employment and earning their livelihood, yet that such an agreement when participated in by all or by a large proportion of employers in any community becomes oppressive and contrary to public policy, because it operates generally upon the craftsmen in the trade, and imposes upon them, as a penalty for refusing to join the favored union, the practical impossibility of obtaining employment at their trade and thereby gaining a livelihood. The evidence makes it quite clear that the objectionable order of September 22, 1904, was of the latter class, for it is in evidence that the Employers' Association embraced nearly every prominent building contractor, and that the "lockout" affected practically the whole building trade in the borough of Manhattan. It is suggested, however, that even if the order to employ only members of the Greater New York Carpenters' Union was beyond the authority of the board of governors of the Employers' Association, still that the earlier orders which merely forbade the employment of members of the Brotherhood of Carpenters were authorized and lawful, and that the disobedience of these by defendants constituted a breach of the conditions of their bonds. Hence it is argued that the illegal order may be ignored and the forfeiture upheld by reason of the disobedience of the earlier orders, which are assumed to have been lawful. The difficulty with this argument is that the defendants did obey the earlier orders, and did lay off their employés in obedience to them. Indeed, for a long time after the issuance of the obnoxious order, they continued to lock out the members of the Brotherhood of Carpenters, and made efforts to obtain a sufficient number of carpenters from outside the membership of that organization. There certainly is no reason to suppose that, if defendants had filled up their working force with carpenters unaffiliated with any labor organization, the Employers' Association would have accepted their action as a compliance with its orders, for the violation of the illegal order of September 22, 1904, is expressly included in the bill of complaint as a reason for forfeiting the bonds sued upon.

The judgment appealed from must therefore be reversed, and a new trial granted, with costs to the appellant to abide the event.

PATTERSON, P. J., and LAUGHLIN, J., concur.

INGRAHAM, J. (dissenting). This case was tried at Trial Term before the court, a jury having been waived. The appellant does not claim that the facts found were not sustained by the evidence. The court found that the defendant, the Thompson-Starrett Company, was a domestic corporation incorporated under the business corporation law in the year 1899 (Laws 1892, p. 2042, c. 691) for the purpose of conducting and carrying on the business of builders and contractors, and to perform engineering and architectural work, including the preparation of plans and specifications and expert work as acting and consulting and superintending engineers and architects; that prior to the 10th of June, 1904, a voluntary association was organized known as the "Building Trades Employers' Association," of which the de-

fendant, the Thompson-Starrett Company, was a member; that this association adopted what was called a constitution, which stated that the object of the association was to foster the interest of those engaged in the erection and construction of buildings and other structures, to reform abuses relating to the business of persons so engaged, to secure freedom from unjust and unlawful exactions, to obtain and diffuse accurate and reliable information as to all matters affecting such persons, to procure uniformity, harmony, and certainty in the relations existing between employers, mechanics, and laborers, and in all lawful ways to promote and protect the business interests of the members of the association, but that there was no intention, nor would there be any action on the part of the association, to control or in any way deal with prices or restrict competition; that there was to be a board of governors consisting of three representatives from each of the specified employers' associations and such other associations as might be provided for. This board of governors were to have power to—

"decide all controversies, difficulties and differences arising between members of the association and their employés, to determine and regulate the conduct of the members of the association relative to such controversies, difficulties and differences, and to decide all disputes and disagreements arising between the employers' association represented on the board of governors and employés' organizations. Also all controversies, difficulties and differences arising between different employers' associations represented on the board; to determine, regulate and control the conduct of such employers' associations relative to such disputes, difficulties and differences, and generally to determine, regulate and control the conduct of the members of this association and the employers' associations represented on the board in all matters pertaining to their relations with their employés, or in any and all matters affecting the building industry or the business interests in such building industry of the members of the association, and for this purpose to make general rules and regulations, provided, however, that where the controversy, difficulty or difference existing affects members of only one employers' association represented on the board of governors, the board of governors shall take no action except upon the request of the governors of the association in which the difficulty, difference or controversy exists. * * * The decisions, orders, prohibitions and regulations of the board of governors shall be final and obligatory upon each and every member of this association, and shall be complied with, obeyed and observed in good faith by every such member."

Article 10 provided that the—

"representatives from sixty (60) per cent. of the associations represented on the board shall constitute a quorum for all business, except that of ordering a cessation or resumption of work by any or all of the members of this association. When the question of ordering a cessation or resumption of work by any or all of the members of the association is before the board, representatives from not less than seventy-five (75) per cent. of the associations represented on the board shall constitute a quorum, and to order a cessation or resumption of work at least four-fifths (⁴/₅) of the vote must be in favor of such an order."

Article 11 provided that:

"In order to insure the compliance with and obedience to the decisions, orders, prohibitions and regulations of the board of governors, all represented and individual members shall give bonds to this association. The form and amount of such bonds shall be determined by and satisfactory to the board of governors."

In compliance with this provision, the Thompson-Starrett Company executed as principal, and the defendant, the Fidelity & Deposit Company of Maryland, as surety, four bonds which, except as to the amount, were substantially the same. The first bond was dated the 10th day of June, 1904; the second was dated the 22d of June, 1904; the third bond was dated on the 19th day of July, 1904; and the fourth on the 2d of December, 1904. Upon each of these bonds there is a cause of action alleged in the complaint, the plaintiff demanding judgment for the amount specified in the four bonds. Upon the first bond the defendant, the Thompson-Starrett Company, called the principal, and the defendant, the Fidelity & Deposit Company of Maryland, called the surety, "are held and firmly bound unto the Building Trades Employers' Association, and Charles M. Eidlitz, as president of the Building Trades Employers' Association, and his successors, and the individual members thereof (called the obligees) in the sum of fifteen hundred ($1,500) dollars," for the payment of which the obligors jointly and severally bound themselves. The bond then recites that the principal had been represented as a representative member of the Building Trades Employers' Association, one of the obligees, upon the principal's agreement and stipulation "herein and hereby evidenced, that said principal will obey and execute all decisions, orders, prohibitions and regulations of the board of governors of said Building Trades Employers' Association, given in pursuance and made under the authority of the constitution and by-laws of said association, immediately upon service upon said principal of a copy of the same duly certified by the secretary of said association; and also upon the execution and delivery of this undertaking to said association, to pay to said obligees the sum of fifteen hundred dollars ($1,500) for liquidated damages to said obligees, by reason of any noncompliance of said principal with said agreement and stipulation"; and the condition of the obligation is "that if the said principal shall duly and faithfully obey and execute any and all such decisions, orders, prohibitions, and regulations of said board of governors of the said Building Trades Employers' Association, given in pursuance and under the authority of the constitution and by-laws of said association, then this undertaking shall be void; otherwise to remain in full force and effect." The defendant, the Thompson-Starrett Company, having thus qualified as a member of this association by the execution and delivery of these bonds, it remained in full membership thereof during the periods hereafter mentioned. There is certainly nothing in the objects of this association as stated in the constitution which is illegal under the laws of this state, or opposed to its policy. There is no statute or public policy that prevents individuals or corporations engaged in the erection and construction of buildings from associating themselves together for such a purpose, nor is the method adopted illegal. The association was to be governed by a board of governors, who were given power of rather an extraordinary nature, as they related, not so much to the management of the affairs of the association as to determining controversies between the members of the association as between themselves, or between members of the association and their

employés; but as the members of this association were capable of contracting, I know of no rule of law that limits them in making such a contract.

A scheme of arbitration was adopted by which, in the event of a dispute between any member of the association and its employés, the question in dispute could be settled by arbitration, rather than a resort to strikes or force; and provision was made for the enforcement of an agreement to arbitrate which should be made between the employers who were members of the association and their employés, and for the enforcement of any award which would result from such an arbitration. There is nothing in the constitution to show that anything more was intended than to accomplish this result. I cannot see that it was beyond the power of any business corporation to enter into such an agreement. It related entirely to the prosecution of its business, and adopted means of settling disputes which had become very common between employers of labor and their employés. The evidence here shows that prior to the organization of this voluntary association the conditions had become such that it was almost impossible for any one to make a contract with any reasonable assurance of its being completed without submitting to extortion and blackmail, and, such a condition existing, there certainly could be no reasonable objection to the organization of either the employers or employés to provide for a settlement of these disputes by arbitration or agreement, and thus relieve a situation which had become intolerable. To accomplish such a result, it was necessary that the associates should act together so long as the object sought to be attained was legal; and the associates certainly could agree that they would bind themselves to carry out the order of a majority to accomplish this result. The orders that the members of the association were bound to obey were necessarily those which had relation to the object for which the association was organized, and the condition of the bond in each case was that the principal would obey and execute any and all such decisions, orders, prohibitions, and regulations of the said board of governors, given in pursuance and under the authority of the constitution and by-laws of the said association. Clearly a decision, order, prohibition, or regulation of the board of governors which had no relation to the object for which the association was organized would not be binding upon its members, and a refusal to execute it would not be a violation of the condition of the bond. The decision of this controversy, therefore, must necessarily depend upon the question as to whether or not the orders of this board of governors were given in pursuance and under the authority of the constitution and by-laws of the association; and, second, whether the principal upon these obligations disobeyed or refused to execute any of such legal directions.

The learned counsel for the appellant in his brief states that:

"The court below has held that the regulations of the board of governors were authorized by its constitution. For the purposes of this appeal, it will be assumed that the constitution of the Building Trades Employers' Association did authorize the regulations of the character and having the effects of those in question. The question is then presented whether a constitution conferring such authority upon a board of governors could be accepted by the

Thompson–Starrett Company or any other corporate member of the association."

By this I understand that counsel for the appellant expressly conceded that the orders and regulations of the board of governors were authorized by the constitution, and, as the constitution authorizes no order or prohibition that is either opposed to the law of this state or its policy, it is difficult to see how any question is presented on this appeal. The objects of the association are to be determined by its constitution and by-laws, and not by orders or directions that its board of governors subsequently gave. If the question is presented, however, it is unnecessary to determine that all the orders or resolutions of the board of governors were given in pursuance of and under the authority of the constitution and by-laws of the association. There is certainly a serious question presented as to whether the order of September 22, 1904, so far as it requires the defendants not to employ any workman who would not join the new union called "The Greater New York Carpenters' Union," was authorized by the constitution or was a requirement that could bind the members of the association. If there was any evidence that this association was organized for the purpose of compelling all workmen to join a particular union before they were employed, it would be clearly an illegal association under Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, for it was there expressly held that "public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling; and if the purpose of an organization or combination of workingmen be to hamper or to restrict that freedom, and, through contracts or arrangements with employers, to coerce other workmen to become members of the organization and to come under its rules and conditions, under the penalty of the loss of their position and of deprivation of employment, then that purpose seems clearly unlawful, and militates against the spirit of our government and the nature of our institutions"; and a combination among employés to compel all workmen to join a particular labor union was held to be void. In Jacobs v. Cohen, 183 N. Y. 207, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 111 Am. St. Rep. 292, Curran v. Galen is referred to as unaffected as an authority by any of the subsequent decisions of the court. In that case, a contract between an employer, an association of its employés, and a labor union which had no relation to either, which required the employer to employ only men of this labor union, was upheld. Judge Gray, in delivering the opinion of the court in that case, says:

"Organization, or combination, is a law of human society. It is open to all orders of men who desire to accomplish some lawful purpose through the greater strength and effectiveness which organization offers over individual effort. If surrender of individual liberty is involved in combination, that is, nevertheless, but an extension of the right of freedom of action. If, therefore, the organization of workingmen is not obnoxious to moral, or to legal, criticism, and only the use, or directing, of the power of the organization to injure others by preventing them from following their trade is visited by the law with its condemnation, how can it fairly be said that the refusal of a body of men to work with those not in affiliation with them, and an agreement with the employer by which such are excluded from the shop, is acting beyond legally justifiable limits?"

But this order of September 22, 1904, does not seem to be an order of the board of directors of the association, but is more a recommendation or direction of "Emergency Committee," which, so far as I can see, had no authority to make such an order, and for a violation of such an order the bond would not be forfeited. There is, however, a direct order of the board of governors of August 4, 1904, by which the members of the association are directed and ordered to "lay off all carpenters * * * on Monday morning, August 8, 1904." The principal of this bond recognized this order and obeyed it. On the 12th of August, 1904, a resolution was adopted by the governors:

"That if the unions now on strike do not return to work on the jobs on which they have struck, on or before the morning of August 22d, the members of this association shall proceed with such mechanics as will agree to work under the conditions of employment as they existed on August 1st, and governed by aforementioned agreements."

In the answer it is alleged that this resolution of August 12, 1904, was intended and understood to require all members of the plaintiff association to employ thereafter in the place and stead of the laborers discharged and locked out pursuant to the said resolution of August 4, 1904, only such laborers as would sign the arbitration agreement of the plaintiff association; and the defendants seem to admit that they disobeyed that order by re-employing members of this Brotherhood of Carpenters whom they had discharged under the order of August 4, 1904, without their agreeing to work under the conditions of employment that existed on August 1st. There was thus, it would appear, an admitted refusal to obey and execute the order and regulation of the board of governors, which, as before stated, is conceded to have been authorized by the constitution of the Building Trades Employers' Association.

It seems to me, therefore, that the condition of the bond was forfeited, and the judgment should therefore be affirmed.

CLARKE, J., concurs in result.