ÆOLIAN CO. et al. v. FISCHER et al.

Circuit Court of Appeals, Second Circuit.
December 10, 1928.

No. 84.

For opinion below, see 27 F.(2d) 560.

Manton, Circuit Judge, dissenting.

Pavey & Higgins, of New York City (James C. Higgins and Walter Drew, both of New York City, of counsel), for appellants.

Morris Hillquit, of New York City, for appellees Fischer and others.

James E. Smith, of New York City, for appellees Wilson and Preiss.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above). ■ The appellants claim that they are entitled to an injunction under the provisions of the Sherman Act (26 Stat. 209), as amended by the Clayton Act (38 Stat. 730). The lower court found against this contention because the defendants did not conspire to exclude plaintiffs' organs from interstate commerce, but only to coerce the employment of union labor in the local work of installation and maintenance. The object of the defendants' conduct was not to compel plaintiffs to unionize their factories, as in Duplex Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, or to prevent customers from buying plaintiffs'. organs when made by nonunion factory labor, as in Bedford Co. v. Stone Cutters' Ass'n, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791, but was to prevent nonunion men from doing the work of installing the organs within New York City and northern New Jersey. The indirect result of this might be to impede the sale of plaintiffs' organs within this territory, but such indirect interference with interstate commerce is not within the prohibition of the Anti-Trust Act. Industrial Ass'n v. United States, 268 U. S. 64, 77, 45 S. Ct. 403, 69 L. Ed. 849; United Mine Workers v. Coronado Co., 259 U. S. 344, 411, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. The decisions in the billposters' case, Ramsay Co. v. Bill Posters Ass'n, 260 U. S. 501, 43 S. Ct. 167, 67 L. Ed. 368, and the moving picture films case, Binderup v. Pathé Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308, depend upon a direct purpose to restrain the transit of goods across state borders—a purpose which is lacking in the case at bar.

Therefore the appellants must establish, if they would show themselves entitled to an injunction under the federal statutes, that the work of setting up their organs in New York or New Jersey—such work being what the defendants seek to monopolize—is itself interstate commerce because part of the interstate commerce involved in sending the organ from another state. There are two opposing lines of decisions. On the one side are the lightning rod, the signal switch, and the bridge cases in which erection was held to be local business subject to local control. Browning v. Waycross, 233 U. S. 16, 34 S. Ct. 578, 58 L. Ed. 828; Gen. Ry. Signal Co. v. Virginia, 246 U. S. 500, 38 S. Ct. 360, 62 L. .Ed. 854; Kansas City Steel Co. v. Arkansas, 269 U. S. 148, 46 S. Ct. 59, 70 L. Ed. 204. On the other side, are the picture frame and the ice machine cases in which installation service was held to be relevant and appropriate to the interstate sale and hence excluded from state interference. Dozier v. Alabama, 218 U. S. 124, 30 S. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264; York Mfg. Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611. The distinction between the two classes of cases is not easily discernible. As suggested by Judge Denison in a dissenting opinion in Cone v. New Britain Machine Co. (C. C. A.) 20 F.(2d) 593, 597, the dividing line would seem to fall between shipping into the state raw materials there to be manufactured into deliverable form, and the assembling within the state of an article requiring skill to set up, of which an interstate sale had been made.

If this be the dividing line, and we see no other, it is the opinion of a majority of the court that insufficient facts were presented by the plaintiffs to enable the court to determine on the motion for a preliminary injunction whether installing the organs should be held to be local work or an integral part of an interstate sale. Neither the bill of complaint nor the supporting affidavits appear to have been drawn with this precise issue in mind. No attempt is made to differentiate installation from maintenance or repair, yet clearly maintenance and repair for any considerable period after the organ had been set up and delivered could not be considered a part of its interstate transportation. The only contract of sale set forth verbatim refers to the organ as "now in Concert Hall at 29 West Forty-Second street," and contains nothing to indicate that the installation of it in the clubhouse of the purchaser will have any relation to interstate commerce.

Diligent search of the affidavits discloses statements which do tend to support the plaintiffs' contention. For example, it is said in Mr. Votey's affidavit that the organs are manufactured at the factory in New Jersey and shipped directly to the jobs in New York under orders taken by the salesmen in New York, and in Mr. Estey's:

"The organs after being assembled and tested in the factory in Vermont are taken down and shipped to the various buildings where they are to be installed, and are there reassembled and tested."

Generally, however, the affidavits speak only of "installing" the organs, just as the bill does. This term gives no aid on the issue under discussion. The line between construction and assembling can only be drawn by one having detailed knowledge of what the work involves. On the other hand, the affidavits also state facts which are not favorable to the plaintiffs' contention. It appears that the installation of the organ in the Elks' Club may take a month to complete, and defendant Meller states that the installation of an organ "is as much a part of the building operation as the installation of the steam plants, plumbing and electric fixtures," that the work of installing involves steel metal work, carpentry, and electrical work, and that usually the equipment and apparatus are so large and extensive that special provisions have to be made in the building in the course of its construction. These facts tend to an inference that the work of erecting an organ is more like local construction, as in the bridge and signal switch cases, than like mere assembling, as in the ice plant and picture frame cases. In short, the precise nature of the work is so meagerly disclosed that the question cannot be determined on this record. After trial the court will doubtless be better informed. The appellants had the burden of satisfying the court that a preliminary injunction should issue. We cannot say that error was committed in refusing it on the ground that the defendants' conduct was not clearly shown to violate the federal statutes.

Basing federal jurisdiction upon diversity of citizenship, the appellants further claim that under the state law the conduct of the defendants should be enjoined. The question presented is whether it is unlawful for union men engaged in the construction of a building, or for unions engaged in the operation of theaters, to refuse to work while nonunion men of another craft are at work on the premises. In Bossert v. Dhuy, 221 N. Y. 342, 117 N. E. 582, Ann. Cas. 1918D, 661, it was held lawful to refuse to work for contractors who used plaintiff's nonunion made goods. However, the union which refused to work included only the same craft as that which made the boycotted goods. There was no question of allied crafts, as in the case at bar. Here Organ Workers' Local No. 9 has become affiliated with the New York Building Trades Council, which includes all of the building trades excepting the iron and steel workers, and with the Combined Amusement Crafts, which is a labor organization composed of various trades engaged in the operation of theaters. Thus is brought to the aid of Organ Workers' Local No. 9, in its effort to secure for its own membership the work of installing, maintaining, and repairing plaintiffs' organs, the power of numerous allied crafts who appear to have no interest in the controversy, except a general desire to promote the cause of union labor. How far unions in different crafts may go in combining to aid a given craft to strengthen its union, or, in other words, how closely allied in fact must crafts be to justify such cooperation, is a question upon which the state law does not appear to have been authoritatively declared. Auburn Draying Co. v. Wardell, 227 N. Y. 1, 124 N. E. 97, 6 A. L. R. 901, held unlawful a boycott against a trucking company which would not operate upon a closed union shop basis. There the defendants not only refused to deal with plaintiff, but also influenced tradesmen and other customers not to do so. Whether their conduct would have been lawful, if they had influenced only members of labor unions is by no means clear. See Nat. Protective Ass'n v. Cumming, 170 N. Y. 315, 63 N. E. 369, 58 L. R. A. 135, 88 Am. St. Rep. 648, and compare Curren v. Galen, 152 N. Y. 33, 46 N. E. 297, 37 L. R. A. 802, 57 Am. St. Rep. 496, Jacobs v. Cohen, 183 N. Y. 207, 212, 76 N. E. 5, 2 L. R. A. (N. S.) 292, 5 Ann. Cas. 280, 111 Am. St. Rep. 730, McCord v. Thompson-Starret Co., 129 App. Div. 130, 113 N. Y. S. 385.

Considering that the question of law was doubtful, and that "facts bearing upon the inquiry are peculiarly lacking from the papers submitted upon this motion," the District Court denied the injunction and offered the plaintiffs an immediate trial. He acted within his discretionary power in so doing, and should not be overruled, unless there was an obvious abuse of discretion. Decorative Stone Co. v. Building Trades Council, 13 F. (2d) 123 (C. C. A. 2). We do not think there was. Seldom can labor disputes wisely be decided upon affidavits and counter affidavits. On the present issues the law is too uncertain to be applied without full knowledge of the facts. The suit raises questions of importance to the public as well as to the parties, and should be awarded a final hearing promptly. Such a hearing plaintiffs rejected in order to appeal, but, for the rea-

sons stated, the issues cannot be satisfactorily passed upon on the present record.

Accordingly the decree is affirmed.

MANTON, Circuit Judge (dissenting). This is a suit in equity, brought by the appellants for an injunction to restrain a course of conduct carried on by the appellees in the city of New York and vicinity in maintaining a boycott against the products and the installation of the appellant companies' organs in the buildings of their customers, and in furtherance of a conspiracy to injure and destroy their good will, trade, and business. Jurisdiction is based upon (a) the diversity of citizenship, and (b) a violation of the Sherman Act, as amended by the Clayton Act, resulting in the obstruction and destruction of its interstate trade.

There are six organ manufacturers who are appellants, all foreign corporations, except the Wurlitzer Company, and all have factories outside of New York, where their organs are made and shipped from their respective factories to motion picture theaters, churches, and other buildings, public and private. Contracts are made through the appellants' sales forces, calling for shipments direct from the factory to the purchaser, where they are assembled and installed by appellants' own employees especially skilled in this work. There was no strike or interference with the work of manufacturing the organs at the appellants' factories. There are some allegations of threatened strikes, but the controversy arises about the assembling and installing. This work takes place in New York City and vicinity, including the state of New Jersey. The appellants maintain an open shop, both in their factories and outside work, and have refused to unionize, or pay men the scale of wages adopted by the unions, or adopt the suggestions of the union as to working conditions. The work of installation is highly specialized.

The appellees named are Organ Workers' Local No. 9, doing work in the city of New York and its vicinity, including northern New Jersey. It is part of a larger organization, the Piano, Organ & Musical Instruments Workers' International Union of America, which has branches throughout the country. Among the other labor unions named are Local No. 3, International Brotherhood of Electrical Workers, Riggers' Union Local No. 170, International Association of Bridge and Structural Iron Workers, Local No. 28, International Association of Sheet Metal Workers, Combined Amusement Crafts, Piano, Organ & Musical Instruments

Workers' International Union of America, New York Building Trades Council of Greater New York and Long Island, and individual defendants, all of whom have to do with building construction.

In December, 1925, a strike occurred by which, through the order of Local No. 9, it was sought to require a wage scale and working conditions which the manufacturers would not agree to. It lasted 14 weeks and failed. Since then, appellee Meller, delegate of Local No. 9, committed certain acts and made statements and threats to call off all the building trades if installation work on the organs was permitted to proceed. Because of this, members of the various building trade unions engaged in building operations where the employees of the appellants were engaged in the installation or maintenance of pipe organs joined in the building trade strikes, and by causing or threatening to cause strikes coerced and intimidated general contractors, architects, and owners of theaters and buildings to cancel their contracts with the appellants. It also delayed the work of the appellants, and caused them to work at night and at other times when the building trades were not engaged at work upon the building, and sometimes delayed their work until the building had been completed. Coercion was brought to bear on the Combined Amusement Crafts, which was a labor organization composed of various trades engaged in the operation of theaters.

Meller affiliated himself, and thereby his union, with other unions, and threatened to cause a shutdown in the theaters by sympathetic strikes of theatrical workers in places where the appellants' workmen were engaged in installing or repairing organs. It resulted in the cancellation by theater owners of their contracts for maintenance and the repair of organs, and it delayed performance of the installation of new organs. Local No. 9 from time to time caused other unions named to withhold their aid to the appellants' workmen in building their organs while being installed. Instances of this were Local No. 3, International Brotherhood of Electrical Workers' refusal, when instigated by Local No. 9, to give electric light, which was necessary for the work of installing the organs; the Riggers' Union Local No. 170 refused to hoist organ parts and materials for the purpose of installation, and Local No. 28, International Association of Sheet Metal Workers, harassed the appellants by making claims as to their right to do sheet metal work outside as well as within the organ.

Local No. 9 became a member of the New York Building Trades Council after the strike in 1925. The Building Trades Council is shown to have been familiar with the efforts of Meller and the Organ Workers' Local No. 9 to unionize the work of installing and maintaining organs within the field of their operation. Threats of general building trade strikes if nonunion organ workers were not removed were made against the installation of organs in the Elks Club, Brooklyn; Universal Theater, Brooklyn; Plaza Theater, Linden, N. J.; Ritz Theater, Lyndhurst, N. J.; Marble Hill Theater, New York City; Rutgers Presbyterian Church, New York City; Monroe and Embassy Theaters, New York City; Tuxedo, Paramount, and Kenmore Theaters; Pythian Temple; Capitol Theater; Colony Theater; Loew's Mt. Vernon and Mark Strand; and Hammerstein's Temple of Music. These threats resulted in locking out the Æolian Company's workers from their tools and organ at the Elks Club; a strike of the electricians and the cancellation of the contract for the Universal Theater installation; in finishing of the Stanley-Fabian Theater contract by Wurlitzer men, who were compelled to work at night to avoid others striking; the cutting off of the Wurlitzer men's light on their work at the Ritz Theater; an assault on an organ worker on the Marble Hill Theater; and the cancellation of the contract and the employment of union men by the Plaza Theater. These men were finally discharged and the Wurlitzer men recalled to finish the job, working double time. It also resulted in their working overtime at the Ritz Theater.

The Meller men were only allowed to return to the Pythian Temple job after the contractor reinstated them in the union after a delay of some weeks and damage to the organ from dampness in the meantime. There was a cancellation of the Estey contract on the Capitol Theater; the Skinner Organ Company was obliged to unionize its workers on the Colony Theater as a condition of finishing the work; there were threats of arrests and some arrests were made of appellants' employees. These occurrences and acts of interference unquestionably impaired the business and good will of the appellants. Many of these facts are found by the trial court. A careful reading of the record discloses them. A trial could add little more.

The only defendants appearing are the Organ Workers' Local No. 9 and its president and delegate Meller, the Piano, Organ, and Musical Instruments Union Workers, International Union of America, Local No. 3 of the Brotherhood of Electrical Workers, and the Combined Amusement Crafts. Meller also submits an affidavit in opposition.

The organs and their parts, shipped in interstate commerce, must be assembled and installed when they reach the building designed for them. The appellants claim that they are engaged in interstate commerce in the sale and installation of their organs, and that the conduct of the appellees interferes with that commerce, and violates the Sherman Act (26 Stat. 209), which makes unlawful every combination or conspiracy of restraint in trade and commerce among the several states. Section 16 of the Clayton Act (chapter 323, 38 Stat. 730 [15 USCA § 26]) permits the maintenance of a suit for injunctive relief in the courts of the United States having jurisdiction of the parties for threatened loss or damage for violation of the anti-trust laws when and under the same conditions as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity under the rules governing such proceedings. It requires a bond against damages in the event that the injunction be improvidently granted.

A preliminary injunction will be granted upon a showing that irreparable loss or damage is imminent. Section 20 of the same act (29 USCA § 52) prohibits granting a restraining order as between employer and employees involving or growing out of a dispute concerning the terms and conditions of employment unless necessary to prevent irreparable injury to property or to property rights of the party so making the application and there is no adequate remedy at law. It forbids granting a restraining order or injunction which would prohibit any person or persons, whether singly or in concert, from recommending, advising, or persuading others by peaceful means, to cease performing their work or labor. The claim is that the acts, threats, and conduct here referred to constitute a conspiracy that amounts to more than peaceful and lawful persuasion and has resulted in the loss of customers through fear of business loss. What transpired here, in the innumerable instances referred to in the affidavits, amounted to a secondary boycott and is not exempt from injunctive relief by section 20.

The primary question involved is whether the installation of the organs was part of the interstate commerce of the appellants. Amer. Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 S. Ct. 72.

66 L. Ed. 189, 27 A. L. R. 360. In Ramsey Co. v. Associates Bill Posters of U. S., 260 U. S. 501, 43 S. Ct. 167, 67 L. Ed. 368, the action was for treble damages under the Sherman Law. The plaintiffs were solicitors for advertising for customers in the several states. They prepared, designed, purchased, and sold posters and caused them to be displayed by local operators in many cities and towns throughout the United States and Canada. They contracted with their customers and received pay for the entire service of preparing, designing, purchasing, and posting the advertisements, and were thus engaged in interstate commerce. The defendant was an organization of many bill posters, whose purpose was to monopolize the business in their respective localities by restricting the membership to one bill poster in each town, preventing members from accepting work from an advertiser who dealt with a nonmember and other similar means. As a result, the plaintiff suffered business loss.

The lower courts held "that, after the posters have arrived at destination, the posting of them by the bill poster is purely local service, not directly affecting, but merely incidental to, interstate commerce." But the Supreme Court held otherwise, saying: "We cannot accept this view. The alleged combination is nation-wide; members of the association are bound by agreement to pursue a certain course of business, designed and probably adequate materially to interfere with the free flow of commerce among the states and with Canada. As a direct result of the defendants' joint acts plaintiffs' interstate and foreign business has been greatly limited or destroyed. * * *" The installation of organs is much like the posting of bills in this case.

In Binderup v. Pathé Exchange Inc., 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308, another action by an exhibitor for treble damages under the Sherman Law, it appeared that the plaintiff was in the business of selecting and distributing to a circuit of motion picture theaters films and other advertising matter and under agreement with other operators in various parts of the state. The defendants were distributors and manufacturers, and distributed their films throughout the country. Distribution was through agencies in various cities for delivery to exhibitors who hired them. Some of the distributors were under contracts with the plaintiff, by which they leased films to him with the right to display them at named theaters. They controlled distribution of all films in the United States. Some of the distributors demanded a share of the plaintiff's patronage, and on his refusal threatened to put him out of business, and induce those with whom he was dealing to cease doing business with him, and had him blacklisted on the Board of Trade in his home city, and his business was thus ruined.

The Supreme Court held that the film contracts were between residents of different states and "contemplated the leasing by one to the other of a commodity manufactured in one state and transported and to be transported to and used in another. The business of the distributors of which the arrangement with the exhibitor here was an instance, was clearly interstate. It consisted of manufacturing the commodity in one State, finding customers for it in other states, making contracts of lease with them, and transporting the commodity leased from the state of manufacture into the states of the lessees. If the commodity were consigned directly to the lessees, the interstate character of the commerce throughout would not be disputed. Does the circumstance that in the course of the process the commodity is consigned to a local agency of the distributors, to be by that agency held until delivery to the lessee in the same state, put an end to the interstate character of the transaction and transform it into one purely intrastate? We think not. The immediate delivery to the agency did not end and was not intended to end the movement of the commodity. It was merely halted as a convenient step in the process of getting it to its final destination. The general rule is that, where transportation has acquired an interstate character, 'it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.' "

In Duplex Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196, complainant was a Michigan corporation, working on an open shop basis, and the defendants were a part of the international association of machinists, a local organization of that larger body. They combined together with the national organization to compel the complainant to unionize its factory. The latter made newspaper presses, required a considerable force of labor, and a considerable expenditure of time to handle, land, and erect them at the point of delivery in New York. They were there delivered in the ordinary course of interstate commerce. The handling, hauling, and installation work was all done by the employés of the purchaser under the supervision of a specially skilled machinist of the complainant.

The acts complained of dealt solely with the installation and operation of the machines by the complainant's customers. The acts complained of were, as the Supreme Court stated them, "warning customers that it would be better for them not to purchase, or having purchased not to install, presses made by complainant, and threatening them with loss should they do so; threatening customers with sympathetic strikes in other trades; notifying a trucking company usually employed by customers to haul the presses not to do so, and threatening it with trouble if it should; inciting employees of the trucking company, and other men employed by customers of complainant, to strike against their respective employers in order to interfere with the hauling and installation of presses, and thus bring pressure to bear upon the customers; notifying repair shops not to do repair work on Duplex presses; coercing union men by threatening them with loss of union cards and with being blacklisted as 'scabs' if they assisted in installing the presses; threatening an exposition company with a strike if it permitted complainant's presses to be exhibited; and resorting to a variety of other modes of preventing the sale of presses of complainant's manufacture in or about New York City, and delivery of them in interstate commerce, such as injuring and threatening to injure complainant's customers and prospective customers, and persons concerned in hauling, handling, or installing the presses."

In granting an injunction, the court said: "That complainant's business of manufacturing printing presses and disposing of them in commerce is a property right, entitled to protection against unlawful injury or interference; that unrestrained access to the channels of interstate commerce is necessary for the successful conduct of the business; that a widespread combination exists, to which defendants and the associations represented by them are parties, to hinder and obstruct complainant's interstate trade and commerce by the means that have been indicated; and that as a result of it complainant has sustained substantial damage to its interstate trade, and is threatened with further and irreparable loss and damage in the future; is proved by clear and undisputed evidence. Hence the right to an injunction is clear if the threatened loss is due to a violation of the Sherman Act as amended by the Clayton Act."

In the Duplex Case there were affirmative acts of interference with the hauling of the presses to the place where they were to be erected, and here the acts complained of are centered around the installing of the organs, but in the Duplex Case there was interference with both the hauling and installing and the injunction which the court decreed at the close of the opinion restrained interference with both hauling and installing. The acts committed, resulting in the interference, may have been more forceful and destructive than in the instant case, but it is clear that the court found that it resulted in secondary boycott as to installation work. It does not alter the case that the effort was to unionize the complainant's factory labor in Michigan in the Duplex Case. York Mfg. Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611. In the case at bar, the effort is made to unionize the workers who install the organs.

In Bedford Co. v. Stone Cutters' Ass'n, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791, the plaintiff was an Indiana company selling stone for building purposes; 75 per cent. of its stone was sold in interstate commerce. The defendant was a general union, made up of various local unions throughout the country, dealing with various phases of the stone cutters trade. The effort there was to compel the plaintiff to employ only men in the general union and to order the local unions not to work on any of the plaintiff's stone. This order was carried out, and the men stopped work on local jobs, not because of the dispute with the contractor, but confessedly because of the plaintiff's "unfair" stone, which was being used. It was to prevent this use, and consequently the shipment in interstate commerce, and thus to force the plaintiff's terms, that the strike was called. The court granted an injunction restraining the defendants and said:

"From a consideration of all the evidence, it is apparent that the enforcement of the general order to strike against petitioners' product could have had no purpose other than that of coercing or inducing the local employers to refrain from purchasing such product. * * * That the means adopted to bring about the contemplated restraint of commerce operated after physical transportation had ended is immaterial. * * * The product against which the strikes were directed, it is true, had come to rest in the respective localities to which it had been shipped, so that it had ceased to be a subject of interstate commerce, * * * and interferences for a purely local object with its use, with no intention, express or implied, to restrain interstate commerce, it may be assumed, would not have been a violation of

the Anti-Trust Act. * * * But these interferences were not thus in pursuit of a local motive; they had for their primary aim restraint of the interstate sale and shipment of the commodity. Interstate commerce was the direct object of attack 'for the sake of which the several specific acts and courses of conduct [were] done and adopted.' And the restraint of such commerce was the necessary consequence of the acts and conduct and the immediate end in view."

In the instant case, while unionizing the installation men may be claimed to be the local end, the attainment of that end was accomplished by a direct restraint upon interstate commerce; the contracts for the organs provided for installation. It was as much a part of the interstate commerce as the shipment of the organ itself. In International Brotherhood of Electrical Workers v. Western Union Tel. Co. (C. C. A.) 6 F.(2d) 444, 46 A. L. R. 1538, the plaintiff conducted an open shop. It had electrical forces in various cities, which installed call boxes, a device in office buildings for signaling the telegraph office to send a boy to take a message, and the defendant, in an effort to unionize the plaintiff's workers, called strikes on buildings where the plaintiff's men were working, and thus induced the owners of buildings to prevent the plaintiff from doing its work. The Circuit Court of Appeals affirmed the issuance of a temporary injunction.

Such cases as Browning v. Waycross, 233 U. S. 16, 34 S. Ct. 578, 58 L. Ed. 828, involving the erection of lightning rods; General Ry. Signal Co. v. Virginia, 246 U. S. 500, 38 S. Ct. 360, 62 L. Ed. 864, involving a signal switch; and Kansas City Steel Co. v. Arkansas, 269 U. S. 149, 46 S. Ct. 59, 70 L. Ed. 204, involving a structural bridge— are to be distinguished, for in each it was held that the erection constituted a local business. Dozier v. Alabama, 218 U. S. 124, 30 S. Ct. 649, 54 L. Ed. 965, 28 L. R. A. (N. S.) 264, concerned a contract to purchase a picture. The purchaser had the option to take, at a specific price, the frame in which the picture should be delivered, and both picture and frame were manufactured and delivered in another state, and remained part of the property of the vendor until paid for. The sale of the frame was held to be a part of the original transaction and protected by the commerce clause of the Constitution. Installing an ice plant in York Mfg. Co. v. Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611, was held to be a part of the interstate sale. I agree with what

Denison, J., said in Cone v. New Britain Mach. Co. (C. C. A.) 20 F.(2d) 593:

"It seems to me that the true distinction between the two cases must be this: In the Waycross Case the thing sold [erected lightning rods] had never been the subject of interstate transportation; the vendor shipped into the state raw materials; within the state they were manufactured into deliverable form; in the York Case [ice machines], the sale and shipment were interstate transactions and the expert services were merely incidental to the main transaction. * * * On the other hand, a contract to direct the assembling of complex machinery is as 'appropriate and relevant' to its sale as a frame is to a picture."

Whether the Clayton Act and the Anti-Trust Law have been breached depends on whether or not there is a direct and material interference with interstate commerce. It is not an answer to say that the strike was directed against the products in states other than where the original labor trouble arose, or that the action of the appellees centered about the locality where the installation took place. It is sufficient that there was a conspiracy to prevent the installation of organs, coming under contracts which provided for installations directly from other states to purchasers in New York and New Jersey. The plan of the local union seems to have been part of a wider general scheme of the parent union to require the organ manufacturers to unionize their workers in New York and New Jersey, where part of their work had to be performed in carrying out their contracts. It is demonstrated that more than peaceful persuasion was involved. There was manifest conduct on the part of the unions to stop the sale of the organs and prohibit their installation.

Resorting to such methods as threatening customers and fomenting sympathetic strikes of other trade unions engaged in work upon buildings where organs were installed was beyond the privileges granted by section 20 of the Clayton Act. Such strikes were not due to dissatisfaction by workers with their immediate employers, but were due to a desire to assist to unionize appellants' men. This constituted an unlawful restraint of trade and commerce between the states. The affidavits submitted disclose what the work of installation consists of, and makes clear enough, if, indeed, it was necessary to do so, that an organ is no part of its housing structure. Likewise they adequately describe the interstate character of this commerce. It is

the very basic claim of the appellants, upon which they hoped to succeed.

I therefore dissent.