UNITED STATES v. PAINTERS' DIST. COUNCIL NO. 14 OF CHICAGO AND VICINITY OF BROTHERHOOD OF PAINTERS, DECORATORS AND PAPER HANGERS OF AMERICA et al.

No. 8556.

District Court, N. D. Illinois, E. D.

Oct. 9, 1930.

George E. Q. Johnson, U. S. Atty., of Chicago, Ill., John Lord O'Brian, Asst. to Atty. Gen., and Mary G. Connor, Sp. Asst. to Atty. Gen., for the United States.

Wm. E. Rodriguez, of Chicago, Ill. (John M. Humphrey, of Chicago, Ill., of counsel), for defendants.

LINDLEY, District Judge.

The government brings this proceedings in equity against defendants, viz., Painters' District Council No. 14 of Chicago of painters and others, Chicago local unions of the Brotherhood of Painters, Arthur W. Wallace, secretary-treasurer of the council, certain business agents of the council, recording secretaries of the local unions and, as a class, represented by the council and the local unions, all of the members of the local unions, alleging that defendants have entered into a combination and conspiracy for the purpose of preventing manufacturers of finished kitchen cabinets, store fixtures, and interior woodwork, whose manufacturing plants are located in states other than the state of Illinois, from selling and delivering their products in Chicago. The allegation is that this conspiracy since early in 1927 has unlawfully restricted and interfered with the free flow of commerce between the states of Indiana, Kentucky, and Illinois, contrary to the provisions of the Anti-Trust Law (15 USCA § 1 et seq). Thus it is observed that this is not a controversy between employer and employees, but a suit in which the issue is as to whether or not defendants, irrespective of their association with labor organizations, have unlawfully interfered with interstate commerce.

In support of its position the government has produced evidence as follows: It has been customary for some time for manufacturers in the state of Indiana, who produce and sell built-in kitchen cabinets, to manufacture the same in Indiana and ship the same to Chicago as well as other parts of the United States, so far as painting is concerned, in a finished condition. Until the interference complained of, this painting was done in the factories by means of an air spray, and dried in a high temperature. Interior woodwork has been manufactured in the same manner in Kentucky and Wisconsin and sold and shipped in a completely finished condition into Chicago. The paint or lacquer was applied thereto in the factories with a spray, and cannot be effectively applied with a hand brush. Defendants' rules in Chicago forbid the finishing of such work with a spray. None of the manufactured work could be finished on the various jobs on the ground in Chicago as effectively as in the factories, and all work was completed and finished at the factories in accordance with specifications from contractors, who buy the articles to place in apartment buildings and similar structures.

In the year 1927 defendants decided that the painters of Chicago, that is, members of the union, should paint kitchen cabinets and other similar woodwork, then being brought into the state in finished condition, and should compel manufacturers to bring their products into the state unfinished, so that the finishing might be done by local painters. The minutes of the council meeting held September 29, 1927, refer to such agreement and decision, and on December 15, 1927 the council included in its minutes the following: "Motion made and seconded that the Business Agents be instructed to pull all jobs where cabinets come in with more than a protective coat. Motion carried." Similar decision with the same ultimate end in view with regard to finished interior woodwork is evidenced by the minutes of meetings of council held at various times during the year 1929. The secretary-treasurer of the council refused to permit retouching on finished woodwork installed in the Foreman National Bank building, and notified the Kentucky union painters that sprayed work from Louisville would not be handled in Chicago. Defendants through their business agents called strikes of painters and glaziers at work in buildings in which outside finished products were being installed, and repeatedly announced that painters would not be allowed to work in buildings where such finished products were being brought in and installed.

Certain of defendants stated to the representatives of the manufacturers that their representatives would throw business in the way of the manufacturers if they agreed to the conditions imposed, and that they would pass the word around to decorators and painters that the manufacturers were in good standing so far as such conditions were in question. They insisted that the goods must be shipped into Chicago with only a prime coat of paint thereon, and that Chicago painters must be employed to put at least two coats of enamel upon the cabinets upon their arrival in Chicago to be placed in the buildings. The manufacturers testified that the finish thus produced is inferior to that produced in the factory by means of sprays, and that as a result of the pressure put upon them by defendants various building contractors canceled orders and stated that they were compelled to refuse to place orders with manufacturers who had no permission from the union to ship their goods into Chicago finished. The business of the manufacturers in Chicago decreased materially. Defendants offered no evidence.

Without reciting the facts in detail, it is sufficient to say that it is apparent that defendants were engaged in a plan whereby

they decided to and did prevent shipment in interstate commerce into Chicago of manufactured products in anything other than an unfinished condition; that the effect of this was materially to curtail the volume of business in Chicago and to impose upon the manufacturers engaged in interstate commerce onerous conditions that resulted in the installation of their products in Chicago in a condition of finish inferior to that which they were prepared to furnish, and had previously furnished themselves. By threats of strikes, by coercing demands, by statements that they would fight in court for their position, defendants' openly took the position that, right or wrong, they would prevent the shipping into Chicago by interstate commerce of finished products.

Defendants insist that the evidence shows at the most merely a position upon their part opposed only to the installation of finished cabinets by the local contractors; that interstate commerce terminated with delivery by the manufacturers upon the job; that such delivery was completed by placing the cabinets upon the sidewalks in front of the buildings; and that therefore any interference by defendants was wholly local in character and did not directly affect interstate commerce.

 Manufacture of cabinets in Indiana and Kentucky, even though those articles were intended to be shipped out of those states, was not interstate commerce. United Leather Workers v. Herkert, 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566; Hammer v. Dagenhart, 247 U. S. 251 at page 272, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; D., L. & W. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397; United Mine Workers v. Coronada Co., 259 U. S. 344 at page 411, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. But shipping manufactured articles from one state into another obviously constitutes such commerce, and it becomes necessary therefore to determine whether the interference complained of was merely local in character, as contended by defendants, or whether it unreasonably restricted interstate commerce.

The evidence shows, in the minutes of the painters' council, a communication from one of the manufacturers "agreeing to abide by our regulations to ship cabinets with only one protective coat and finish with two coats on the job"; a communication from the McDougall Cabinet Company in Indiana to the effect that they have "now agreed to ship cabinets with only one protective coat and finish with two coats on the job"; a minute

that Sellers & Son, Indiana manufacturers, after their vice president had been ordered before the board, agreed "that in the future the cabinets will be shipped with only one protective coat." McDougall testified that he appeared before the council and told them that his company "would agree to bring in the products so that they might apply the last two coats," and that thereafter his company shipped all products with only a prime coat, to receive the last two coats on the job. Thornburg, representative of an Indiana manufacturer, testified that he told the council he was present to find out what could be done "about shipping in our kitchen cabinets"; that the secretary replied there had been objection to shipping in the painted cabinets, and we would have to ship them in unfinished"; that his company "agreed to ship them in that way." Williams, an Indiana manufacturer, testified that the representatives of defendants told him "that he would have to stop shipping cabinets; that they would have to be painted upon the job itself in Chicago." Wasmuth, an Indiana manufacturer, testified that at the office of the council he was told that he could "no longer continue the arrangement that we had with him whereby we are sending our equipment into Chicago with the finish on, and that we would have to ship it either unfinished or with the first coat on to be finished in Chicago"; and that thereafter his company shipped its merchandise into Chicago in a primed condition, as demanded. Cavanaugh, another manufacturer, testified that defendant council advised him "that cabinets could not be brought in in a finished state." Johnson, representative of a Louisville company, testified that the council advised him that any work that came into Chicago with spray work on it would not be handled there. The minutes of the council show that "charges will be preferred against any member who fails to report a job where the work comes in already finished"; that a motion was made and carried that the business agents be instructed to pull all jobs where cabinets "come in" with more than one protective coat; that certain unions instructed their delegates to "strike all jobs where trim comes on job finished."

The words "coming in" appear repeatedly in the minutes of defendant council, and considering the testimony of the representatives of the manufacturers, the minutes of the council themselves, there is only one possible conclusion, and that is that the defendants in order to achieve a certain local result were

in fact directly interfering with the shipping in of cabinets from Indiana and woodwork from Kentucky; that although their purpose may have been entirely local in character, their actions in attempting to achieve that purpose necessarily and directly resulted in keeping out of the state of Illinois such finished articles as had previously been shipped from Indiana and elsewhere. As stated in Aeolian Co. v. Fischer (C. C. A.) 40 F.(2d) 189, 193, the injury to the manufacturers "is not merely incidental; the direct and immediate purpose is to oust the appellants and their employees from the conduct of their business in New York and its vicinity unless they submit."

Some courts have said that whether or not interstate commerce has terminated is decisive of the question of whether such commerce is interfered with and that this depends upon whether the shipper's contract imposes upon him the duty of installing or erecting a permanent edifice in integral form, the separate or united elements of the thing sold, Aeolian Co. v. Fischer, 29 F.(2d) 679 (C. C. A. on preliminary injunction) and 40 F.(2d) 189 (C. C. A. on permanent injunction); but I am unwilling to say that such is the true or the only test. Such installation or erection upon the part of the vendor may be a material circumstance upon the question, but in the end the essential inquiry is whether the acts of the defendant, even though intended to promote a local purpose, did in fact necessarily and inevitably, directly and substantially, and unreasonably restrict or interfere with interstate commerce. Duplex Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; Binderup v. Pathé Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308.

The defendants effected a practical boycott upon the articles manufactured and shipped from Indiana and attained their announced and recorded purpose of preventing the shipment of the same to the state of Illinois. The court is unable to distinguish this situation from the one of Bedford Cut Stone Co. v. Stone Cutters' Ass'n, 274 U. S. 44, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791, and other cases cited by the government.

There are cases arising upon the question as to whether or not the work of installation performed by a nonresident corporation is a part of interstate commerce in which the courts have held that such goods are taxable under the state revenue law, but as announced by the Supreme Court in the case of Binderup v. Pathé Exchange, it does not follow that because a thing is subject to state taxation it is also immune to federal regulation under the commerce clause.

The case, therefore, is very similar to that of Bedford Cut Stone Co. v. Stone Cutters' Association, 274 U. S. 44, 47 S. Ct. 522, 524, 71 L. Ed. 916, 54 A. L. R. 791, where the defendants, the members of the Stone Cutters' Association, were charged with violation of the Anti-Trust Act by conspiring to restrain interstate trade in limestone produced in quarries in other states. The defendants there decided and directed that no work should be done on stone which had been produced by labor ineligible to membership in the General Union. The evidence showed many instances of interference with the use of petitioner's stone in interstate commerce, and expressions of apprehension upon the part of customers of labor troubles if they purchased the stone. The court remarked that the union had no grievance against the contracting builders; that the strikes were ordered and conducted for the sole purpose of preventing the use and, consequently, the sale and shipment in interstate commerce of the petitioners' product. The language of the court seems peculiarly applicable to the instant case. The court said: "Interstate commerce was the direct object of attack. * * * And the restraint of such commerce was the necessary consequence of the acts and conduct and the immediate end in view. * * * In other words, strikes against the local use of the product were simply the means adopted to effect the unlawful restraint. And it is this result, not the means devised to secure it, which gives character to the conspiracy. * * * The evidence shows indubitably that it was an attack upon the use of the product in other states to which it had been and was being shipped, with the intent and purpose of bringing about the loss or serious reduction of petitioners' interstate business, and thereby forcing compliance with the demands of the unions. * * * Whatever may be said as to the motives of the respondents or their general right to combine for the purpose of redressing alleged grievances of their fellow craftsmen or of protecting themselves or their organizations, the present combination deliberately adopted a course of conduct which directly and substantially curtailed, or threatened thus to curtail, the natural flow in interstate commerce of a very large proportion of the building limestone production of the entire country, to the gravely probable disadvantage of producers, purchasers, and the public; and it

must be held to be a combination in undue and unreasonable restraint of such commerce within the meaning of the Anti-Trust Act as interpreted by this court." The court proceeded to announce that it is immaterial whether the petitioner at the time of the bringing of suit had suffered actual injury, and said that it is enough to justify equitable interposition by injunction if there be a dangerous probability that such injury will happen, for "the Anti-Trust Act 'directs itself against that dangerous probability as well as against the completed result.'"

As announced in the recent case of Boyle v. United States, 40 F.(2d) 49, 51, by the Circuit Court of Appeals for this Circuit: "The contention that appellants themselves were not engaged in interstate commerce is not of importance. It is not necessary to a violation of the statute that the transgressors themselves be engaged in such commerce. Knauer v. United States (C. C. A.) 237 F. 8. The pertinent inquiry is, Did they enter into a combination which had, or would have, the effect of restraining interstate commerce? Their manifest purpose was, in part, to embarrass, divert, and restrain the trade of various foreign manufacturers of and dealers in candies and confectionery, and thereby to diminish, and if possible altogether to suspend, the flow of that commerce into Chicago and vicinity." Other cases directly in point are United States v. Brims, 272 U. S. 549, 47 S. Ct. 169, 71 L. Ed. 403; Duplex Printing Press Co. v. Deering et al., 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; Aeolian Co. et al. v. Jacob Fischer et al. (C. C. A.) 29 F.(2d) 679; Id., 40 F.(2d) 189 (C. C. A. 2); Irving v. Brotherhood of Carpenters (C. C.) 180 F. 896, 900; Montague & Co. v. Lowry, 193 U. S. 38, 24 S. Ct. 307, 48 L. Ed. 608; Eastern States Lumber Ass'n v. United States, 234 U. S. 600, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Boyle v. United States, 259 F. 803 (C. C. A. 7); Wholesale Grocers', etc., v. Federal Trade Com. (C. C. A.) 277 F. 657.

It is not because defendants are members of labor unions that they are subject to restraint in this action; it is because defendants, irrespective of the purpose or character of their organizations, have unreasonably interfered with interstate commerce. The same action upon the part of building contractors or upon the part of owners of apartment houses would amount to the same unlawful action and be subject to the same restraint.

Under the authorities I am of the opinion that interstate commerce was herein involved; that a conspiracy or combination to accomplish its unreasonable restraint appears. Notwithstanding any worthy motive inspiring defendants, they cannot be permitted to violate the statute in attempting to promote such motive. There will be a decree as prayed at the costs of defendants.